FILED
United States Court of Appeals
Tenth Circuit

**March 4, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

THOMAS A. PACE and KAROL
PACE, Heirs of Angie Putnam,
Deceased,

     Plaintiffs-Appellants,

v.

BARRY N. SWERDLOW, M.D.,

     Defendant-Appellee.

No. 06-4157

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:06-CV-27-K)**

---

Kenneth R. Ivory, Ivory Law, P.C., Sandy, Utah (C. Michael Lawrence, C.
Michael Lawrence, P.C., Taylorsville, Utah, with him on the briefs), for
Plaintiffs-Appellants.

J. Anthony Eyre (J. Kevin Murphy, with him on the brief), Kipp and Christian,
P.C., Salt Lake City, Utah, for Defendant-Appellee.

---

Before **BRISCOE, GORSUCH,** and **HOLMES**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

     This is a diversity action which was dismissed under Fed. R. Civ. P.

12(b)(6) for failure to state a claim upon which relief can be granted. Plaintiffs Thomas A. Pace and Karol Pace ("Plaintiffs"), the parents and heirs of the deceased, Angie Putnam, brought this action against Defendant Barry N. Swerdlow ("Defendant"). Plaintiffs originally hired Defendant, a licensed physician, to serve as their expert witness in a medical malpractice case Plaintiffs had filed in Utah state court. In the medical malpractice case, Plaintiffs had sued the surgical center and the doctors who treated their daughter and released her from their care shortly before she died. After the state court dismissed the medical malpractice case, Plaintiffs filed the present action against Defendant in Utah state court. Defendant removed the case to federal court based upon diversity jurisdiction. Plaintiffs claim that Defendant's abrupt change of position, on the eve of trial, caused the state court to dismiss their medical malpractice case. Specifically, Plaintiffs allege that Defendant committed (1) professional malpractice, (2) fraud, (3) negligent misrepresentation, (4) breach of fiduciary duty, (5) breach of contract, (6) breach of the implied covenant of good faith and fair dealing, and (7) negligent infliction of emotional distress. Defendant filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and the district court granted the motion, holding that Defendant's change of position was not the proximate cause of the state court's decision to dismiss the medical malpractice case. We have jurisdiction pursuant to 28 U.S.C. § 1291 and reverse and remand.

2

Plaintiffs are residents of Utah, and they are bringing this action pursuant to Utah Code Ann. § 78-11-6.5 (2007), as the parents and heirs of their daughter, Angie Putnam. Ms. Putnam died after her release from the hospital after having breast augmentation surgery. Prior to her release, it is alleged that she complained to doctors that she was having difficulty breathing and was experiencing pain of nine on a scale of ten. Following her death the night of her surgery, Plaintiffs filed a medical malpractice action against the doctors who treated her. Pace v. Shuput, Case No. 0030906272 (Utah, Third Dist. Ct.).

Defendant is a licensed physician and a resident of California who approached Plaintiffs' counsel, Michael Lawrence, to offer his services as an expert witness in the medical malpractice case. Plaintiffs retained Defendant as their expert witness and supplied him with the medical records pertaining to Ms. Putnam's surgery and subsequent death. After reviewing the records, Defendant documented his opinion in an affidavit dated September 8, 2003. In the affidavit, Defendant stated his belief, "based upon a reasonable degree of medical certainty, that Dr. Shuput and IHC Surgical Center did breach the appropriate standard of care when releasing Angela Putnam under the circumstances . . . ." Aplt. Br., Ex. A, at 2, ¶ 5.[1] Defendant also stated, "Given my expertise, training, education,

---

[1] Dr. Shuput was the attending anesthesiologist who released Ms. Putnam shortly before she died. He was also the primary defendant in the Plaintiffs'

(continued...)

experience, and pursuant to a reasonable degree of medical certainty, it is my opinion that Putnam should not have been released but should have been monitored overnight. If she had been monitored overnight, it is very likely that she would be alive today." Id. at 3, ¶ 15. Originally, this last sentence read, "If she had been monitored overnight, she would be alive today," but Defendant added the phrase, "it is very likely that," in his own handwriting. See id. In addition, Defendant's affidavit opined,

> It is further my opinion that it is a breach of the standard of care for both the anesthesiologist and/or Surgical Center, whoever made that decision, to have released Putnam with her symptoms of difficulty breathing and the level of chest pain she was experiencing. Again, she should have been admitted to the hospital and monitored through the night.

Id. at 4, ¶ 17. Finally, Defendant stated his ultimate conclusion that, "[a]s a direct and proximate result of her premature discharge, Putnam died." Id. at 4, ¶ 18. Defendant did not alter this last sentence from its original wording. See id.

On April 23, 2004, Plaintiffs' counsel, Mr. Lawrence, wrote a letter to Defendant, in which he requested that Defendant review Dr. Shuput's written discovery responses. The discovery responses contained Dr. Shuput's reasons for discharging Ms. Putnam, rather than admitting her to a hospital and monitoring her condition. Defendant did not alter his affidavit after reviewing these discovery responses. In addition, Mr. Lawrence provided Defendant with a copy

---

[1](...continued)
medical malpractice case.

of Dr. Shuput's deposition transcript, and another of Plaintiffs' retained counsel, Gregory Hansen, again made Dr. Shuput's deposition transcript available to Defendant immediately before Defendant's own deposition was taken on January 4, 2005.[2]

When Defendant was deposed, he did not prove to be a strong advocate for Plaintiffs' claims. Opposing counsel asked Defendant if he "believe[d] it's consistent with ethical practices [for] expert witness[es] in the guidelines approved by the [American Society of Anesthesiologists ("ASA")] to testify against an anesthesiologist when you have not asked for his deposition transcript, if there is one, so that you can see his side of the story?" Id. at 57. Defendant responded, "I think it would have been good for me to have seen it, and I did not ask for it. I did not think to ask for it. And I wouldn't comment upon the ethics thereof." Id. Defendant also admitted that he had "never testified in trial," that he "was not aware that Dr. Shuput's deposition had been taken," and that he was "a relative novice at this whole thing." Id. at 55, 65.

As for the merits of Plaintiffs' claim, Defendant testified that his "ultimate opinion here is that discharging this patient with severity of pain, as documented in the PACU record, was not something that a prudent physician in Dr. Shuput's

---

[2] Defendant appears to claim that he did not receive a copy of Dr. Shuput's deposition transcript until after Defendant's own deposition, but because this is a motion to dismiss under Fed. R. Civ. P. 12(b)(6), we must construe all factual allegations in the light most favorable to Plaintiffs. See infra Part II.

5

situation should have done." Id. at 64.  As to causation, Defendant and opposing

counsel had the following exchange:

> Q: Are you of the opinion, Doctor, that if the patient had been admitted to the hospital, she would be alive today?
>
> A: I'm of the opinion that if she had been admitted to the hospital, there's an increased probability that she would have been alive today.
>
> Q: But you cannot state within a reasonable degree of medical probability, can you, Doctor, that she would have been alive today if she had been admitted to the hospital?
>
> A: Correct.

Id. at 63.  Defendant also agreed that "Dr. Shuput was not required under the

standard of care to read [Ms. Putnam's] pain score," and that if Dr. Shuput "was

reassured that this patient's pain was moderate, reasonable, then he doesn't need

to look at [the pain score]."  Id. at 58, 59.  Further, Defendant testified that he did

not know what Dr. Shuput knew about Ms. Putnam's pain complaints, id. at 61,

and that Dr. Shuput "would not have breached the standard of care" if "he felt the

patient was not [at] that level of severity," id. at 62.

At the end of the deposition, Defendant was asked if he had "any other

opinions or criticisms that [he] intend[ed] to offer in this case," or had "any

clarifications or retractions of any statements that [he had] given today that [he]

would like to make."  Id. at 66.  To both questions, Defendant responded, "Not

that I can think of."  Id.  Mr. Hansen then told Defendant that, once the deposition

transcript was available, Defendant would have two weeks to review it and get the

6

changes back to Mr. Lawrence, after which Mr. Lawrence would deliver them to opposing counsel. Id. at 67.

Following the deposition, Defendant called Mr. Lawrence by phone and complained that opposing counsel was "mean." Defendant also told Mr. Lawrence that he did not want problems with his license.[3] Defendant requested a copy of Dr. Shuput's deposition transcript, and Mr. Lawrence sent him a copy, as well as copies of the deposition transcripts of the two surgical center nurses. After receiving these transcripts, as well as the transcript from his own deposition, Defendant made edits and drafted a two-page "Addendum" to his deposition. During this time, Defendant did not communicate with Plaintiffs or their counsel, Mr. Lawrence and Mr. Hansen.

The Addendum to Defendant's deposition directly opposed Plaintiffs' malpractice claims and supported Dr. Shuput's defense. Defendant stated that he had reviewed the deposition transcripts of Dr. Shuput and the nurses, and "on that basis, [he] wish[ed] to modify [his] opinions accordingly." Compl. Ex. F, Supp. ROA, at 70. He ultimately concluded:

> As such, it is apparent that Dr. Shuput and the PACU nurses, on the basis of their appropriate assessment of Ms. Putnam's postanesthetic

---

[3] Defendant disputes this characterization of the conversation and "claims that Dr. Shuput's counsel threatened to report him to the [ASA], a professional organization that provides policy guidelines but has no power with respect to licensure." Dist. Ct. Op., Aplt. ROA, at 43. Because this is a motion to dismiss under Fed. R. Civ. P. 12(b)(6), however, we must construe all factual allegations in the light most favorable to Plaintiffs. See infra Part II.

recovery course, felt that the pain level was "not as documented by the pain score and was much more moderate and mild." Therefore, it is now my opinion, that Dr. Shuput's care of Ms. Putnam—and specifically his decision to discharge her from the Intermountain Surgery Center on 2-20-01—was within the standard of care.

Id. at 71-72 (citation omitted). On Friday, February 11, 2005, without contacting Mr. Lawrence or Mr. Hansen beforehand, Defendant simultaneously submitted this Addendum by facsimile to Mr. Lawrence and opposing counsel.[4]

Several days earlier, Dr. Shuput had filed a motion for summary judgment. Dr. Shuput based his motion, in part, on a lack of causation—i.e., that Defendant's deposition testimony did not show that Dr. Shuput's care or treatment caused Ms. Putnam's death. With the summary judgment hearing approaching on Monday, February 14, 2005, and trial scheduled for approximately one week later, Plaintiffs attempted to contact Defendant about his Addendum, but they were unsuccessful. They also sent a letter to Defendant, demanding that he repair the damage that he had caused to Plaintiffs' case. At the summary judgment hearing, Plaintiffs were able to obtain a brief continuance, but when Defendant refused to help them, Plaintiffs moved for another continuance (of both the hearing on the summary judgment motion and the trial), withdrew Defendant as their testifying expert, and filed a motion with the court for permission to designate a different liability expert witness to replace Defendant.

---

[4] The Addendum itself is dated February 6, 2005. Compl. Ex. F, Supp. ROA, at 72.

Plaintiffs attached Defendant's Addendum to these motions. Plaintiffs did not file a memorandum opposing the motion for summary judgment.

Ultimately, the Utah state court denied Plaintiffs' motions and granted summary judgment in favor of Dr. Shuput in the medical malpractice action. In its formal order, the court explained:

> The Court, thus having been fully advised of the Motions and Memoranda filed in this case and being fully aware of the record, facts and arguments in the matter and finding good cause appearing therefore, GRANTED Defendant Shuput's Motion for Summary Judgment With Prejudice for the reasons and upon the grounds stated therein and for the reason that Dr. Swerdlow's testimony and Addendum fail to meet the grounds necessary to pursue any malpractice claim against Dr. Shuput.

Decision and Order of Utah State Court, Compl. Ex. I, Supp. ROA, at 82-83. Plaintiffs did not seek reconsideration or appeal this decision.

Instead, Plaintiffs commenced the instant action against Defendant in Utah state court. Plaintiffs allege that Defendant's abrupt change of position, on the eve of trial, caused the state court to dismiss their medical malpractice case. Specifically, Plaintiffs present claims for (1) professional malpractice, (2) fraud, (3) negligent misrepresentation, (4) breach of fiduciary duty, (5) breach of contract, (6) breach of the implied covenant of good faith and fair dealing, and (7) negligent infliction of emotional distress. Defendant removed the case to federal court and filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), arguing that (1) witness immunity barred Plaintiffs' claims, (2) Defendant's modified opinion

9

was not the sole or primary ground for dismissal of the underlying case, and (3) each of Plaintiffs' claims failed upon independent grounds.

The district court granted Defendant's Rule 12(b)(6) motion, holding that Defendant's change of position was not the proximate cause of the state court's decision to dismiss the medical malpractice case. See Dist. Ct. Op., Aplt. ROA, at 47. As a preliminary matter, the court decided not to reach the issue of expert witness immunity because (1) it presented an issue of first impression under Utah law, and (2) the lack of proximate cause was dispositive, rendering a decision on witness immunity unnecessary. Id. at 44. Then, the court held that, even without Defendant's change of position, Defendant's original affidavit was not strong enough to withstand a motion for summary judgment. The court explained that the two statements in the affidavit addressing causation—the statement, "If she had been monitored overnight, it is very likely that she would be alive today," and the statement, "As a direct and proximate result of her premature discharge, Putnam died"—were in conflict and doomed Plaintiffs' medical malpractice case even before Defendant's change of position. Id. at 45-46. The court also explained that Plaintiffs' failure to file a memorandum in opposition to Dr. Shuput's motion for summary judgment contributed to the state court's grant of summary judgment in Dr. Shuput's favor as much as anything else did. Id. at 46-47. Thus, the district court granted the motion to dismiss all seven of Plaintiffs' claims against Defendant. Id. at 47.

II.

As a preliminary matter, the parties dispute whether we should treat the ruling appealed as a grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), or as a grant of a motion for summary judgment under Fed. R. Civ. P. 56(c). Before the district court, Defendant titled his motion as a "Motion to Dismiss" and submitted it "pursuant to Fed. R. Civ. P. 12(b)(6)." Motion to Dismiss, Aplt. ROA, at 37. The district court likewise treated this as a motion to dismiss, and explained:

> Swerdlow argues that Plaintiffs cannot demonstrate as a matter of law that he caused the dismissal of the malpractice action. Because Plaintiffs attached several exhibits from the underlying action to their Complaint, the court can consider those materials and all of the materials referenced in the Complaint on this motion to dismiss. The court can also take judicial notice of all the materials in the state court's file.

Dist. Ct. Op., Aplt. ROA, at 44.

The district court was correct in considering these materials on a motion to dismiss under Fed. R. Civ. P. 12(b)(6). See Utah Gospel Mission v. Salt Lake City Corp., 425 F.3d 1249, 1253-54 (10th Cir. 2005) ("We have recognized however, that a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute."); Dean Witter Reynolds, Inc. v. Howsam, 261 F.3d 956, 961 (10th Cir. 2001) ("It is accepted practice that, 'if a plaintiff does not incorporate by reference or attach a document to its complaint,

11

but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.'" (quoting GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997))), rev'd on other grounds, 537 U.S. 79 (2002); Zimomra v. Alamo Rent-A-Car, Inc., 111 F.3d 1495, 1503-04 (10th Cir. 1997) (citing Fed. R. Evid. 201 as "authoriz[ing] a federal court to take judicial notice of adjudicative facts at any stage of the proceedings, and in the absence of a request of a party," and explaining that the district court properly took judicial notice of an ordinance on a motion to dismiss). Thus, we have summarized the facts of the case by citation to the Complaint and documents attached to the Complaint, as well as state court documents of which the district court took judicial notice. See supra Part I.

"We review de novo a district court's decision on a Rule 12(b)(6) motion for dismissal for failure to state a claim." Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007). In doing so, "[w]e must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." Id. (citation and internal quotation marks omitted). In addition, in determining whether to grant a motion to dismiss for failure to state a claim, we "look to the specific allegations in the complaint to determine whether

12

they plausibly support a legal claim for relief." Id. at 1215 n.2.[5]

The district court erred in its determination that "Plaintiffs' loss was [not] caused by any alleged change in opinion by Swerdlow." Dist. Ct. Op., Aplt. ROA, at 47. Under Fed. R. Civ. P. 12(b)(6), we "look to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief." Alvarado, 493 F.3d at 1215 n.2. Viewing this case through the lens of a Rule 12(b)(6) dismissal, we conclude that the district court improperly drew critical inferences against Plaintiffs, and Plaintiffs have alleged facts that, if proven, could establish the proximate cause element in their action against Defendant.

First, the district court improperly concluded that the two statements in the affidavit addressing causation—the statement, "If she had been monitored overnight, it is very likely that she would be alive today," and the statement, "As a direct and proximate result of her premature discharge, Putnam died"—were in conflict and necessarily doomed Plaintiffs' medical malpractice case even before Defendant's change of position. In their underlying medical malpractice action brought pursuant to Utah law, Plaintiffs needed to prove:

> (1) the standard of care required of physicians under similar circumstances practicing in the same field or specialty, (2) that the applicable standard of care was breached, (3) that the injury to the

---

[5] For the fraud claim, the pleading standard is higher: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

13

plaintiff was proximately caused by the defendant's negligence, and (4) that damages occurred as a result of defendant's breach of duty.

Kent v. Pioneer Valley Hosp., 930 P.2d 904, 906 (Utah Ct. App. 1997) (quoting Dalley v. Utah Valley Reg'l Med. Ctr., 791 P.2d 193, 195 (Utah 1990)). "Because of the complex issues involved in a determination of proximate cause in a medical malpractice case, [Plaintiffs had to] provide expert testimony establishing that the health care provider's negligence proximately caused [the] injury." Id. In this context, Utah courts have defined "proximate cause" as follows:

> Proximate cause is "that cause which, in natural and continuous sequence, (unbroken by an efficient intervening cause), produces the injury and without which the result would not have occurred. It is the efficient cause—the one that necessarily sets in operation the factors that accomplish the injury." State v. Lawson, 688 P.2d 479, 482 & n.2 (Utah 1984). Further, there can be more than one proximate cause of an injury so long as each is a concurrent contributing factor in causing the injury. See Anderson v. Parson Red-E-Mix Paving Co., 467 P.2d 45, 46 (1970); Jacques v. Farrimond, 380 P.2d 133, 134 (1963).

Steffensen v. Smith's Mgmt. Corp., 820 P.2d 482, 486 (Utah Ct. App. 1991). Further, under Utah law, "[i]t is well established that the question of proximate cause is generally reserved for the jury," and "[o]nly in rare cases may a trial judge rule as a matter of law on the issue of proximate causation." Id.

Given the Utah proximate cause standard, Defendant's affidavit almost certainly would have enabled Plaintiffs to survive a motion for summary judgment in the underlying medical malpractice action. Tellingly, Dr. Shuput did

14

not view the affidavit as being weak. Rather, in his motion for summary judgment filed in the medical malpractice action, Dr. Shuput's proximate cause argument relied upon Defendant's deposition testimony—not Defendant's affidavit. Nor do the statements, "If she had been monitored overnight, it is very likely that she would be alive today," and, "As a direct and proximate result of her premature discharge, Putnam died," necessarily conflict. The phrase "very likely" denotes a high probability of Ms. Putnam being alive today if her doctors had monitored her overnight. This is perfectly consistent with the affidavit's second statement addressing proximate cause—especially considering that we are analyzing these statements on a motion to dismiss under Fed. R. Civ. P. 12(b)(6). In that context, the district court erred in characterizing them as "conflicting statements."

In addition, the district court erred in its ultimate conclusion that Defendant's change of position was not the proximate cause of the Utah state court granting summary judgment against Plaintiffs in their medical malpractice action. Under the Utah proximate cause standard, "there can be more than one proximate cause of an injury so long as each is a concurrent contributing factor in causing the injury." Steffensen, 820 P.2d at 486. Here, the state court's basis for granting summary judgment in favor of Dr. Shuput was the following:

> The Court, thus having been fully advised of the Motions and
> Memoranda filed in this case and being fully aware of the record,
> facts and arguments in the matter and finding good cause appearing

15

therefore, GRANTED Defendant Shuput's Motion for Summary Judgment With Prejudice for the reasons and upon the grounds stated therein and for the reason that Dr. Swerdlow's testimony and Addendum fail to meet the grounds necessary to pursue any malpractice claim against Dr. Shuput.

Decision and Order of Utah State Court, Compl. Ex. I, Supp. ROA, at 82-83.

This language indicates that Defendant's change of position, as manifested in the Addendum, was "a concurrent contributing factor in causing" the Utah state court to grant summary judgment in favor of Dr. Shuput. See Steffensen, 820 P.2d at 486. As such, and particularly on a motion to dismiss, the district court erred in concluding that Defendant's change of position, as evidenced by his Addendum to his deposition, was not the proximate cause of the state court's grant of summary judgment.

The Plaintiffs' failure to file a memorandum in response to Dr. Shuput's motion for summary judgment does not change the analysis. Dr. Shuput had filed his motion for summary judgment several days before Plaintiffs received Defendants's Addendum to his deposition. Upon receiving Defendant's Addendum, Plaintiffs worked diligently to confront the changed circumstances, and in light of Defendant's abrupt change of position, a responsive filing by Plaintiffs would have made little difference—because Plaintiffs were, at that point, without an expert witness. Plaintiffs have sufficiently alleged that Defendant's change of position, as well as the timing of that change of position, proximately caused the state court's grant of summary judgment, and the district

16

court erred in concluding otherwise.

Because the district court held that the proximate cause issue was dispositive on all seven of Plaintiffs' claims, it never addressed the alternative grounds for dismissal—i.e., whether expert witness immunity barred Plaintiffs' claims, or whether each of Plaintiffs' claims failed upon independent grounds. Based on the record, it is unclear whether Plaintiffs' complaint fails under these alternative grounds. On remand, therefore, the district court is free to determine whether expert witness immunity bars Plaintiffs' claims—including whether that question should be certified to the Utah Supreme Court—or whether, for each of Plaintiffs' seven claims, the allegations in the complaint are sufficient to state a claim upon which relief can be granted. See Conkle v. Potter, 352 F.3d 1333, 1337-38 (10th Cir. 2003).

We REVERSE and REMAND to the district court for further proceedings consistent with this opinion. In addition, Defendant's motion to certify the expert witness immunity issue to the Utah Supreme Court is DENIED with leave to reassert it before the district court.

06-4157, *Pace v. Swerdlow*

**GORSUCH**, Circuit Judge, concurring in part and dissenting in part.

I agree with my colleagues' thoughtful analysis of the proximate cause issue and their conclusion that Dr. Swerdlow has not shown, as a matter of law, that his initial affidavit was so weak or contradictory it would have necessarily failed to defeat summary judgment in the underlying state malpractice action. But we may of course affirm the district court for any grounds supported by the record, *see, e.g.*, *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1206 (10th Cir. 2007), and I respectfully submit that a review of the complaint yields multiple other grounds upon which the district court's decision should be affirmed.

\* \* \*

In *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court changed the way we look at motions to dismiss under Fed. R. Civ. P. 12(b)(6). Prior to *Twombly*, every law student learned from their civil procedure professors the familiar *Conley* refrain that dismissal is inappropriate under Fed. R. Civ. P. 8 and 12 unless it appears beyond doubt that the plaintiff can prove "no set of facts" entitling it to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In *Twombly*, the Supreme Court "retired" *Conley* and instructed that we must determine whether a complaint has set forth factual allegations sufficient to "raise a right to relief above the speculative level." *Id*. at 1965. In doing so, we "look to the specific allegations in the complaint to determine whether they plausibly

support a legal claim for relief." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 n.2 (10th Cir. 2007).[1]

The scenario the Supreme Court addressed in *Twombly* bears striking similarities to the one we face today. There, the plaintiffs alleged that the Baby Bells had entered into a conspiracy to restrain trade in violation of Section 1 of the Sherman Act, *Twombly*, 127 S. Ct. at 1962, and pointed to the Bells' parallel conduct as evidence of such a conspiracy, *id*. at 1964. But the Court emphasized that parallel business conduct can be consistent *either* with an illegal conspiracy *or* with legal pro-competitive business strategies. *Id*. Because the plaintiffs had failed to identify facts plausibly suggesting, rather than merely raising the possibility of, an illegal agreement, the Court dismissed the case.

Here, plaintiffs have alleged facts showing that Dr. Swerdlow changed his expert opinion. But, as in *Twombly*, the facts alleged regarding Dr. Swerdlow's change of opinion could rationally support at least two opposing inferences. First, one might infer that his behavior was unprofessional – Dr. Swerdlow

---

[1] Although some initially argued that *Twombly* is confined to the antitrust context, *see* Keith Bradley, *Pleading Standards Should Not Change After* Bell Atlantic v. Twombly, 102 Nw. U. L. Rev. Colloquy 117 (2007), most courts, including our own, have since held that its effect on pleading standards is considerably broader. *See, e.g.*, *Alvarado*, 493 F.3d at 1215 n.2, *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, —F.3d—, 2008 WL 217724 at *3 (10th Cir. 2008); *Iqbal v. Hasty*, 490 F.3d 143, 157 n.7 (2d Cir. 2007); *Phillips v. County of Allegheny*, —F.3d—, 2008 WL 305025 at *4 (3d Cir. 2008); *see also* Scott Dodson, *Pleading Standards After* Bell Atlantic v. Twombly, 93 Va. L. Rev. In Brief 121 (July 9, 2007).

changed his opinion, we are encouraged to surmise, because he feared counsel's "meanness" and threat to attack Dr. Swerdlow's medical license. Changing one's opinion for such reasons, plaintiffs seem to assert, amounts to professional malpractice or some other form of tortious conduct. Second, and very differently, one might just as easily suppose that Dr. Swerdlow simply and honestly changed his professional opinion about the propriety of Dr. Shuput's actions as he learned more about those actions.

It is, of course, not clear whether Utah recognizes the doctrine of absolute witness immunity, and if it does not, whether it is possible to state a claim for professional malpractice or some similar tort against one's own expert witness. Maj. Op. at 17. But, even supposing that Utah would allow such a suit, plaintiffs' allegations fall well short of the line *Twombly* has drawn. If *Twombly* means anything, it means that plaintiffs had to plead *some* facts that would, if proved, allow a jury to infer both that Dr. Swerdlow's change of opinion was something other than an innocent and professional reassessment of his expert opinion in light of newly considered evidence and that his change of opinion caused their damages.

Perhaps most obviously, one might've addressed these issues by alleging (if the facts permitted it) that another expert, provided with all the information available to Dr. Swerdlow at the time he changed his opinion, still would've thought Dr. Shuput engaged in malpractice – just as in *Twombly*, had plaintiffs

-3-

alleged some facts suggesting a conspiratorial agreement rather than mere parallel conduct, their complaint might well have survived. As it is, however, we are given *no* facts suggesting that any responsible physician, after reviewing the full record, would've thought Dr. Shuput's conduct constituted malpractice. Without factual allegations along these or similar lines, plaintiffs have pled neither a breach of any imaginable standard of care (however broadly that might be defined), nor causation of damages.

The insistence on *factual* allegations tending to suggest actionable rather than innocent conduct is not mere formalism. Rather, the Supreme Court emphasized that it serves at least two vital purposes – to ensure that a defendant is placed on notice of his or her alleged misconduct sufficient to prepare an appropriate defense, *Twombly*, 127 S. Ct. at 1964, and to avoid ginning up the costly machinery associated with our civil discovery regime on the basis of "a largely groundless claim," *id*. at 1966. Specifically, in *Twombly* the Supreme Court was concerned that allowing a claim to proceed that was just as likely predicated on lawful business conduct as on an alleged conspiracy posed a serious risk of penalizing legitimate and even pro-competitive conduct. *Id*. at 1964.

Here, we have cause for even greater concern. Allowing this claim to march along sends the message to would-be expert witnesses: Be wary – very wary – of changing your mind, even when doing so might be consistent with, or compelled by, the standards of your profession. Neither can there be any doubt

this is exactly the message plaintiffs wish to send, candidly explaining, as they do, that their real beef with Dr. Swerdlow was his failure to "deliver[] the expert liability opinion he had promised the Paces all along."  Appellant's Opening Br. at 32.  In our legal system, demanding that experts "deliver" a specified opinion, as opposed to their honest judgment, is supposed to be ethically out-of-bounds – not the basis for a cause of action.[2]

Parties already exert substantial influence over expert witnesses, often paying them handsomely for their time, and expert witnesses are, unfortunately and all too frequently, already regarded in some quarters as little more than hired guns.  When expert witnesses can be forced to defend themselves in federal court beyond the pleading stage simply for changing their opinions – with no factual allegation to suggest anything other than an honest change in view based on a review of new information – we add fuel to this fire.  We make candor an expensive option and risk incenting experts to dissemble rather than change their views in the face of compelling new information.  The loser in all this is, of

---

[2] *See Model Code of Prof'l Responsibility* Canon 7-28 (1983) ("Witnesses should always testify truthfully and should be free from any financial inducements that might tempt them to do otherwise. . . . [A] lawyer may pay or agree to pay an expert witness a reasonable fee for his services as an expert.  But in no event should a lawyer pay or agree to pay a contingent fee to any witness."); *Id.* at Disciplinary Rule 7-109 ("A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony . . ."); *Model Rules of Prof'l Conduct* R. 3.4 cmt. (2004) ("[I]t is improper to pay an expert witness a contingent fee.").

course, the truth-finding function and cause of justice our legal system is designed to serve.[3]

\* \* \*

Even putting aside *Twombly* and the lack of any factual allegations suggesting tortious conduct by Dr. Swerdlow, additional essential elements of the various torts plaintiffs allege are obviously missing, and no purpose is served by remanding this matter except needlessly to drag out this case further and increase the parties' litigation costs.

By way of example only:

We today remand to the district court for further adjudication plaintiffs' claim for negligent infliction of emotional distress. In Utah, however, such a

---

[3] To be sure, plaintiffs complain that, even if Dr. Swerdlow was entitled to change his opinion, he should have done so before his deposition. In aid of this, plaintiffs allege (over Dr. Swerdlow's vociferous denial) that they provided Dr. Swerdlow a transcript of Dr. Shuput's testimony at some – indeterminate – point prior to his own deposition. Compl. ¶ 52. But because, as the majority agrees, expert testimony was a necessary predicate to plaintiffs' success in state court, Maj. Op. at 14, and because plaintiffs have failed to allege that any other expert with full knowledge of the record would've testified for them, or in other words have failed to allege any facts suggesting Dr. Swerdlow's behavior caused summary judgment to be granted against them, they shouldn't be able to recover any damages based on the value of a judgment in their favor in the underlying action. Any recovery necessarily would be limited to the costs and fees they incurred in maintaining their case after the point at which a reasonable expert would have revised his or her opinion. And, this, of course, would be the case only if Utah would recognize professional malpractice claims against expert witnesses and would not apply the doctrine of absolute witness immunity. *See* Maj. Op. at 17 (noting the unresolved issue of potential witness immunity).

claim appears to require that the plaintiff feared physical injury or peril. *Lawson v. Salt Lake Trappers, Inc.*, 901 P.2d 1013, 1016 (Utah 1995). And plaintiffs have not alleged any facts (or even made any conclusory assertions) that they feared physical injury from Dr. Swerdlow's change of opinion.

Plaintiffs also bring claims for fraud and negligent misrepresentation. Under Utah law, both claims require, among other things, a false representation of a material fact. *See Larsen v. Exclusive Cars, Inc.*, 97 P.3d 714, 716 (Utah Ct. App. 2004); *DeBry v. Valley Mortgage Co.*, 835 P.2d 1000, 1008 (Utah Ct. App. 1992). Yet, plaintiffs fail to identify any representations of fact made by Dr. Swerdlow that satisfy these criteria. While plaintiffs conclusorily claim that Dr. Swerdlow misrepresented his qualifications, they fail to identify any *factual* discrepancies between Dr. Swerdlow's qualifications in actuality and as represented. There are, for example, no allegations that Dr. Swerdlow is not in fact a licensed anaesthesiologist competent to present his expert opinion to the court, or that any particular item on his resumé was false. Neither do plaintiffs appear to allege any false statements by Dr. Swerdlow about his experiences serving as an expert. To be sure, plaintiffs point to Dr. Swerdlow's deposition, in which he stated that he had "never testified in trial." Compl. ¶ 84. But they fail to allege that Dr. Swerdlow had ever told them otherwise. Plaintiffs also point to Dr. Swerdlow's statement that he "is a relative novice at this whole thing." Compl. ¶ 83. But the statement was made in the context of explaining why Dr.

Swerdlow had not asked if Dr. Shuput's deposition had been taken before his own, Compl., Ex. E, at 152, and familiarity with the mechanics of the civil litigation discovery process is hardly a characteristic one would necessarily expect in someone holding himself out as an expert in anaesthesiology.  Because plaintiffs have not alleged that Dr. Swerdlow made any representations to dispel this assumption, their claims should fail as a matter of law.

* * *

For the foregoing reasons, and with respect for my colleagues' considered views, I am unable to join fully the court's judgment.