**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**April 14, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

THE ESTATE OF SUSANNE BURGAZ,
by and through personal representatives
Erika Zommer, Kristian Arnold, and
Amelia Eudailey; ERIKA ZOMMER,
individually; KRISTIAN ARNOLD,
individually; AMELIA EUDAILEY,
individually,

      Plaintiffs - Appellants,

v.

BOARD OF COUNTY
COMMISSIONERS FOR JEFFERSON
COUNTY COLORADO; JEFF
SHRADER, in his official capacity;
PETRINA PESAPANE, individually;
JOSEPH SCALISE, individually,

      Defendants - Appellees.

No. 21-1049

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:19-CV-01383-SKC)**
_____

Zachary D. Warren, Highlands Law Firm, Denver, Colorado, for Plaintiffs-Appellants.

Rebecca P. Klymkowsky, Assistant County Attorney, Jefferson County Attorney's
Office, Golden, Colorado (Rachel Bender, Assistant County Attorney, Jefferson County
Attorney's Office, Golden, Colorado, and Gordon Vaughan and David R. DeMuro,
Vaughan & DeMuro, Denver, Colorado, with her on the brief) for Defendants-Appellees.

_____

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **MATHESON**, Circuit Judges.

_____

**TYMKOVICH**, Chief Judge.

_____

Following Susanne Burgaz's suicide in the Jefferson County Detention Facility, Ms. Burgaz's children and estate sued two individual Jefferson County Sheriff's deputies on duty the night she died, and various other County officials. They argued the deputies were deliberately indifferent to her serious medical needs and the County and sheriff negligently operated the jail.

The defendants moved to dismiss the complaint, and the district court granted the motion. We agree with the district court that both individual deputies are entitled to qualified immunity because the Estate failed to allege either deputy violated Ms. Burgaz's constitutional rights. The *Monell* claim against the sheriff was also properly dismissed. And because all the claims arising under federal law were properly dismissed, the district court correctly dismissed the remaining state-law claims.

We therefore AFFIRM the dismissal of all the claims.

## I. Background

### A. *Factual Background*

Ms. Burgaz was arrested and booked into the Jefferson County Detention Facility (JCDF) on August 30, 2017. At her booking, a deputy decided—based on a variety of factors, including a previous suicide attempt at the same jail—to place Ms. Burgaz in the Special Housing Unit (SHU), an area of the jail where

detainees with special medical needs are placed.  Deputies use the jail's information management system, named Tiburon, to view information about inmates, including health information, criminal history, and prior incarcerations.  The Tiburon system noted Ms. Burgaz had significant medical needs including the use of a walker, a history of self-harm, a drug addiction, and a previous suicide attempt at the same jail.  The complaint, however, does not allege that Ms. Burgaz was placed on suicide watch at booking.

The day after Ms. Burgaz was booked, she attended a hearing about her charges, and a judge ordered her released.  After the hearing, Ms. Burgaz was transported back to the jail and placed in the SHU dayroom while she awaited her release.  The dayroom is a small room, filled with only a book cart, a table, chairs, and a mounted television.  The dayroom's only door has a frosted glass pane, and the inside of the dayroom is only visible from the adjacent hallway through a tiny, transparent slit on the frosted glass.

At about 9:02 p.m., Ms. Burgaz, who was alone in the dayroom, used her walker to walk to the window and get the attention of a deputy.  About a minute later, Deputy Petrina Pesapane walked to the window and spoke to Ms. Burgaz.  Ms. Burgaz asked for an update about her release, at which point Deputy Pesapane went to the control room and learned Ms. Burgaz had two outstanding warrants in a different jurisdiction.  Because of the warrants, Deputy Pesapane informed Ms. Burgaz she would not be released that night.  Deputy Pesapane then

helped Ms. Burgaz gather some documents she had left in her cell and escorted her back to the dayroom.

At about 9:09 p.m., Deputy Pesapane left Ms. Burgaz alone again in the dayroom. At 9:17 p.m., Ms. Burgaz began to peer through the door's viewing pane and banging on the door, attempting to get a deputy's attention. About a minute later, she walked back to the table where she had been sitting. At about 9:22 p.m., Ms. Burgaz shuffled over to the wall-mounted television and began to fashion a noose from the wires and cords.

Around that time, at 9:25 p.m., Deputy Joseph Scalise conducted a walk-through of this portion of the jail. During the walk-through, Deputy Scalise walked down the hallway and past the dayroom where Ms. Burgaz was attempting to hang herself. Deputy Scalise did not look directly into the dayroom. Instead, he walked briskly on the far side of the hallway. At 9:28 p.m., he finished his walk-through.

From 9:22 p.m. to 9:29 p.m., Ms. Burgaz twice attempted to hang herself, but the noose did not hold. On her third attempt, she hanged herself. Deputies found her at about 10:00 p.m. Despite medical attention, she died two days later.

### B.  *Procedural Background*

Plaintiffs-Appellants (the Estate) sued Deputies Pesapane and Scalise in their individual capacities, alleging they violated Ms. Burgaz's Fourteenth Amendment right to medical care in jail. The Estate sued the Board of County Commissioners and Jefferson County Sheriff Shrader in his official capacity

- 4 -

based on an entity liability theory for the alleged Fourteenth Amendment violations under 42 U.S.C § 1983.[1]

The Estate also pleaded two state-law violations. The first was for negligence in the operation of a jail resulting in wrongful death against the Board and Sheriff Shrader in his official capacity. The other was a survival claim against the Board, Sheriff Shrader (in his official capacity), and Deputies Pesapane and Scalise (in their individual capacities).[2]

The defendants filed for dismissal for failure to state a claim based on Federal Rule of Civil Procedure 12(b)(6). The court granted the motion and dismissed all the claims. The Estate appeals.

## II. Discussion

The Estate contends the district court erred in (1) granting qualified immunity to both individual deputies; and (2) dismissing the *Monell* and state-law claims against Sheriff Shrader.

---

[1] The district court dismissed all claims against the Board because all parties agreed the Board was an improper party. *See Estate of Blodgett v. Correct Care Sols., LLC*, No. 17-CV-2690-WJM-NRN, 2018 WL 6528109, at *8 (D. Colo. Dec. 12, 2018) (unpublished) (noting that under Colorado law a county board has no control over a sheriff's employees, so the board is not a proper party in a suit alleging entity liability for deputies' violations); *see also Tunget v. Bd. of Cnty. Comm'rs of Delta Cnty.*, 992 P.2d 650, 652 (Colo. App. 1999) ("[T]he trial court correctly held that the sheriff, rather than the county or the Board, would be liable for the actions of the deputy sheriff. Thus, the court properly dismissed the claims against the Board."). We agree and AFFIRM the dismissal of all claims against the Board.

[2] The court dismissed the state-law claims against the individual deputies because the Estate voluntarily agreed to do so.

We review de novo a district court's grant of a motion to dismiss for failure to state a claim. *Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1296 (10th Cir. 2014). To survive a motion to dismiss, a complainant must allege facts that, if true, state a claim to relief that is plausible on its face. *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). In reviewing the motion to dismiss, we accept as true all well-pleaded factual allegations in the complaint and view the allegations in the light most favorable to the non-moving party. *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013).

First, we will assess the deliberate indifference claims against the individual deputies. Then, we will discuss the *Monell* claim against Sheriff Shrader. And finally, we will review the state-law claims against Sheriff Shrader.

## A. *Individual Deliberate Indifference Claims*

The Estate contends that Deputies Pesapane and Scalise were deliberately indifferent to Ms. Burgaz's risk of suicide. The deputies assert qualified immunity, arguing they did not violate a clearly established constitutional right. *See Lindsey v. Hyler*, 918 F.3d 1109, 1113 (10th Cir. 2019). When assessing whether a constitutional violation occurred and whether the law was clearly established, we have the discretion to decide which question to answer first. *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013).

Here, we conclude the Estate failed to plausibly allege a constitutional violation against either deputy because it did not plausibly allege that either

deputy was deliberately indifferent to Ms. Burgaz's medical needs. Consequently, each deputy is entitled to qualified immunity.

Jail officials "cannot 'absolutely guarantee the safety of their prisoners.'" *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015) (quoting *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999)). But jail officials and municipalities have a constitutional duty to take reasonable steps to protect prisoners' safety and bodily integrity. *Berry v. City of Muskogee, Okl.*, 900 F.2d 1489, 1499 (10th Cir. 1990). Claims based on a jail suicide are considered and treated as claims based on the failure of the jail officials to provide necessary medical care for those in their custody. *Cox*, 800 F.3d at 1248. Thus, the claims are assessed for deliberate indifference to serious medical needs. *Estate of Hocker ex rel. Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994).

The test for deliberate indifference has a dual objective and subjective component. For the objective component, the complainant must demonstrate that the deprivation is sufficiently serious to warrant intervention or treatment. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). The subjective inquiry asks whether the defendants "knew [the detainee] faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it." *Redmond v. Crowther*, 882 F.3d 927, 939–40 (10th Cir. 2018) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (internal quotation marks omitted)).

The objective component of the deliberate indifference test "requires showing the alleged injury is 'sufficiently serious.'" *Redmond*, 882 F.3d at 939 (citing *Self v. Crum*, 439 F.3d 1227, 1230–31 (10th Cir. 2006)). Death by suicide satisfies that requirement. *See Martinez*, 563 F.3d at 1088–89.

The subjective prong requires an official to know of and disregard an excessive risk to a detainee's health or safety. *Redmond*, 882 F.3d at 939–40. "[T]he official must both be *aware* of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also *draw the inference.*" *Id.* at 936 n.3 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (emphases added). An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not a constitutional violation. *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). But even if a jail official has knowledge of a substantial risk of serious harm to detainees, "he is not deliberately indifferent to that risk unless he is aware of and fails to take reasonable steps to alleviate that risk." *Id.*

Even so, although this portion of deliberate indifference is a subjective inquiry, a jury is allowed to infer a jail official had actual knowledge of the substantial risk to serious harm based solely on circumstantial evidence. *Id.* "[I]f a risk is obvious, so that a reasonable man would realize it, we might well infer that [the deputies] did in fact realize it[.]" *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citation omitted; internal quotation marks omitted).

- 8 -

We review the relevant alleged facts to determine whether it is plausible each deputy had actual knowledge of Ms. Burgaz's risk of and ability to commit suicide.

    1.    *Deputy Pesapane*

In assessing the subjective prong of deliberate indifference, we review whether the Estate has plausibly alleged that Deputy Pesapane had actual knowledge of Ms. Burgaz's suicide risk and whether her actions were reasonable. We conclude the Estate has not plausibly alleged Deputy Pesapane had actual knowledge of the risk.

First, we begin with the generally known alleged facts—which were also known by Deputy Scalise. The Tiburon system had some of Ms. Burgaz's medical information and jail history. That information was used by an unknown deputy to place Ms. Burgaz in the SHU and was known by Deputies Pesapane and Scalise because deputies exchange information as a matter of course when starting new shifts.

What specific information was on the Tiburon system? Tiburon noted Ms. Burgaz had various illnesses—physical and mental—and that she had a history of drug addiction. In addition, it also included history of self-harm, involuntary commitment to an inpatient mental health facility, suicidal ideation, and chronic depression. Tiburon also noted Ms. Burgaz "was 'red-flagged' as a suicide risk because she was previously placed on so-called 'suicide watch' while detained" at the jail. Aplt. App. at 13, ¶ 42. In sum, Deputies Pesapane and Scalise were

- 9 -

aware of (1) Ms. Burgaz's mental illnesses and drug addictions, (2) Ms. Burgaz's involuntary commitment to a mental health facility, (3) Ms. Burgaz's suicidal tendencies, and (4) Ms. Burgaz's previous suicide attempt at the same facility.

Next, we look to what Deputy Pesapane learned about Ms. Burgaz through their interactions. The first interaction between Deputy Pesapane and Ms. Burgaz was at 9:02 p.m. in the SHU dayroom, when Ms. Burgaz—who had just returned from a court hearing where a judge had ordered her released—banged on the window of the dayroom to get a deputy's attention. After Ms. Burgaz inquired about when she would be released, Deputy Pesapane learned in the control room Ms. Burgaz could not be released that evening because she had outstanding warrants from other jurisdictions. Deputy Pesapane returned to the window and informed Ms. Burgaz she would not be released from custody.

After being informed she would not be released soon, Ms. Burgaz became despondent, according to the Estate's pleaded facts. Ms. Burgaz initially tried pleading her case with Deputy Pesapane, so Deputy Pesapane escorted her to get some of her paperwork from her cell and then walked her back to the SHU dayroom. During this interaction, in an attempt to secure her release, Ms. Burgaz informed Deputy Pesapane she had recently been the victim of sexual violence. Unable to help that evening, Deputy Pesapane left Ms. Burgaz alone in the dayroom at about 9:09 p.m.

At around 9:22 p.m. Ms. Burgaz made her way over to the mounted television and began to try and fashion a noose with the cords. After multiple attempts, Ms. Burgaz hanged herself at about 9:29 p.m.

The relevant inquiry at this stage of litigation, then, is whether the risk of Ms. Burgaz's suicide was so obvious to Deputy Pesapane when she left Ms. Burgaz alone in the dayroom at 9:09 p.m., such that a reasonable officer would have realized it. *See Garrett*, 254 F.3d at 950. Considering her knowledge of Ms. Burgaz's mental condition and about the JCDF's procedures, we conclude it was not.[3]

Taking as true all of the plausible allegations and drawing all reasonable inferences in favor of the Estate, Deputy Pesapane knew many facts about Ms. Burgaz that, taken together, fail to demonstrate the immediate and serious risk of suicide was obvious. Deputy Pesapane knew Ms. Burgaz (1) had attempted suicide previously at the same facility, (2) had various mental illnesses, (3) had a drug addiction, (4) had recently suffered sexual violence, (5) was despondent after hearing she would not be released soon, and (6) was in the least secure room in the SHU. But even so, there were insufficient indicators to put Deputy Pesapane on notice of the immediate risk.

---

[3] Though we note, in the alternative, that even if she were subjectively aware of Ms. Burgaz's risk of suicide, she would not be deliberately indifferent unless she failed to take reasonable action to abate the risk. *See Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008).

At most, Deputy Pesapane could have known she was interacting with a distressed detainee with a history of mental illness and self-harm.  But there were no obvious indicators of suicide present.  There are no allegations Ms. Burgaz expressed suicidality or intentions to harm herself.  Nor did the Estate allege Ms. Burgaz had been placed on suicide watch during this particular stint at the JCDF.  Ms. Burgaz's interactions with Deputy Pesapane were for her release, not for any medical attention or psychiatric help.  And there is no allegation Deputy Pesapane had been educated to know Ms. Burgaz's grave disappointment at not being released created an imminent risk of suicide.

And even though Ms. Burgaz was under some distress, her suicide in the dayroom could not have been obviously foreseen because there is no reason to believe Deputy Pesapane would have thought Ms. Burgaz was capable of committing suicide in the dayroom without being observed and stopped.  Ms. Burgaz was physically frail, relying on a walker to move about, so she was relatively immobile and less capable of harming herself.[4]  And she was in the SHU, where she would ostensibly be watched by deputies manning the security cameras and by deputies conducting the periodic walk-throughs.[5]  The SHU

---

[4]  The Estate alleged Ms. Burgaz had "significant medical . . . needs," "chronic pain," and "physical disabilities."  Aplt. App. at 13, ¶ 44.   It also alleged she used a walker, *id.* at 20, ¶ 84, and described her movement as "shuffl[ing]," *id.* at 21, ¶ 93.

[5]  According to the Estate, officers are required to "directly observe each of the inmates in the SHU at least once every 30 minutes," Aplt. App. at 8, ¶ 6, the

control room displays sixteen live feeds from the surveillance system, one of which was from a camera in the dayroom. The Estate alleges the camera in the dayroom "has sufficient clarity that any officer monitoring the live feed would immediately recognize [Ms. Burgaz] was attempting suicide." Aplt. App. at 19, ¶ 76.

Although the Estate alleges other suicides have taken place at this jail before, it does not allege that suicides have taken place either in the dayroom or with television cords or on the defendant deputies' watch. There are also no nonconclusory allegations that Deputy Pesapane was aware of the immediate suicide risk posed by the television cords. Consequently, it is not obvious a distressed, physically frail detainee who should have been surveilled constantly would have committed suicide in the dayroom when left alone for twenty minutes.

Accordingly, we find the Estate failed to plausibly allege Deputy Pesapane committed a constitutional violation through deliberate indifference to Ms. Burgaz's serious medical needs.

2.    *Deputy Scalise*

Next, we turn to Deputy Scalise. We find he was unaware of the risk to Ms. Burgaz, so we conclude the Estate has not plausibly alleged he was deliberately indifferent to her medical needs.

---

SHU is "a secure housing unit for inmates with higher needs," *id.* at 14, ¶ 47, and the SHU "dayroom itself is under constant video monitoring," *id.* at 16, ¶ 57.

As we noted previously, Deputy Scalise knew some information about Ms. Burgaz because it was available on Tiburon and shared by deputies at the beginning of shifts. Specifically, he knew Ms. Burgaz (1) had a history of mental illnesses and drug addiction, (2) had a history of suicidal tendencies, (3) had attempted suicide during a previous detention at the same facility, and (4) was currently being detained somewhere in the SHU.

But Deputy Scalise's knowledge was insufficient to infer he had actual knowledge of Ms. Burgaz's risk of harm. Although he may have known she had a history that indicated a higher risk of suicide, he lacked knowledge of other facts that would have clued him in to her imminent and specific danger. And without actual knowledge Ms. Burgaz was suicidal at that time and at an immediate risk, he could not have been *deliberately* indifferent, as opposed to merely negligent, by failing to take the extra few seconds to look in the dayroom.

The immediate risk of suicide was not obvious to Deputy Scalise. At most, he knew Ms. Burgaz was a detainee at the jail who had a history of mental illness, substance abuse, and a previous suicide attempt at the same jail. The Estate does not allege Deputy Scalise and Ms. Burgaz had any interactions where he may have obviously noticed her risk of harm. And as with Deputy Pesapane, there are no allegations Ms. Burgaz expressed a desire to harm herself or that she was on suicide watch.

Accordingly, we conclude he was not deliberately indifferent to Ms. Burgaz's medical needs.

- 14 -

## B. Entity Claims

The Estate also brought a *Monell* claim, asserting Sheriff Shrader caused the violation of Ms. Burgaz's rights by (1) tolerating violations of safety practices, and (2) failing to train and supervise deputies properly. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The Estate contends its entity claims against Sheriff Shrader were improperly dismissed. We disagree.

*Monell* allows plaintiffs to sue local governing bodies (or their functional equivalents) directly under § 1983 for constitutional violations pursuant to a body's policy, practice, or custom. *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1033 (10th Cir. 2020). To state a *Monell* claim against Sheriff Shrader, the Estate must allege facts showing: (1) an official policy or custom, (2) causation, and (3) deliberate indifference. *Id.* at 1034.

For a municipality (or sheriff, in this case) to be held liable for either a failure-to-train or failure-to-supervise claim, an individual officer (or deputy) must have committed a constitutional violation. *Crowson v. Washington Cnty., Utah*, 983 F.3d 1166, 1187 (10th Cir. 2020) ("[A] failure-to-train claim may not be maintained [against a municipality] without a showing of a constitutional violation by the allegedly un-, under-, or improperly-trained officer."); *Id.* at 1191 (citing approvingly *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1155–56 (10th Cir. 2001), which conditioned municipal liability for a failure-to-supervise claim on an individual officer's constitutional violation). Because neither individual

deputy violated Ms. Burgaz's constitutional rights, the failure-to-train and failure-to-supervise claims against the sheriff necessarily fail.

In other types of *Monell* claims, such as those alleging an unconstitutional policy or custom, plaintiffs need not demonstrate an individual officer committed a constitutional violation. Instead, "the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights."[6] *See Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 310 (10th Cir. 1985). In situations where "the municipal [customs] devolve[] responsibility across multiple officers," the customs "may be unconstitutional precisely because they fail to ensure that any single officer is positioned to prevent the constitutional violation." *See Crowson*, 983 F.3d at 1191.

Even so, the Estate's last remaining basis for its *Monell* claim—the sheriff's alleged custom of ignoring safety policy violations—also fails. The Estate argued that a *Monell* claim requires "a municipal employee [have] committed a constitutional violation." Aplt. Br. at 25 (quotation marks omitted) (citing *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998)). It failed to raise the argument that the combined actions of deputies can suffice for certain *Monell* claims. Because the Estate predicates its

---

[6] This point of law has been explicitly reaffirmed despite subsequent contrary precedent. *See Crowson v. Washington Cnty., Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020) (noting that *Garcia* is controlling); *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1033 (10th Cir. 2020) (applying the rule from *Garcia*).

unconstitutional-custom claim on the existence of an individual constitutional violation, and no individual deputy committed a constitutional violation here, the claim fails. To be sure, the Estate could have argued that the deputies' combined actions or omissions somehow violated Ms. Burgaz's rights.[7] But the Estate failed to do so, and instead only made the general allegation that "[Ms.] Burgaz would still be alive" had the sheriff "actually enforced [the corrective] policies." Aplt. Br. at 27. Thus, that argument is waived before this court. *Commonwealth Prop. Advocates, LLC v. Mortgage Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1200 (10th Cir. 2011) (holding issues or arguments insufficiently raised in the opening brief are deemed waived).

For those reasons, we conclude the dismissal of the *Monell* claim was proper.

## C. State-Law Claims

The Estate asserted two state-law claims against Sheriff Shrader for Ms. Burgaz's death. One claim was for survival and the other was for negligence in the operation of a jail. As noted before, the district court dismissed all claims arising under federal law; first the court concluded the Estate failed to allege sufficient facts to state a claim for deliberate indifference against either individual deputy and then dismissed the entity claims against Sheriff Shrader. Once the district court dismissed all the federal claims, it declined to exercise

---

[7] We do not opine on the merits of the hypothetical argument.

supplemental jurisdiction over the two state-law claims at hand and dismissed those claims. *See* 28 U.S.C. § 1367(c)(3).

Because we affirm the dismissal of all the federal claims, we conclude the dismissal of the state-law claims was proper.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court.

21-1049, *Burgaz v. Board of County Commissioners*

**HARTZ, J**., Circuit Judge, concurring

I join the opinion of Chief Judge Tymkovich. I write separately to focus on my difference with the dissent by Judge Matheson regarding Deputy Pesapane.

An inference of deliberate indifference depends on two factors. One is the deputy's knowledge of the risk that Ms. Burgaz would attempt to commit suicide. The other is the obviousness of steps that the deputy could take to reduce or eliminate the risk that Ms. Burgaz would succeed in an attempt. The question before us is whether a jury that considers those factors could reasonably infer from the facts adequately alleged in the complaint that Deputy Pesapane, knowing what she did at the time, acted (or failed to act) in a way that evinced a deliberate indifference to the well-being of Ms. Burgaz.

The panel opinion accurately describes the knowledge factor. The opinion does not say, as might be inferred from the dissent, that Deputy Pesapane would have been totally ignorant of any risk. But it does properly indicate that the allegations of the complaint would not support an inference that the deputy knew that Ms. Burgaz would, as soon as she was left alone, try any means possible to kill herself.

That brings us to the second factor. What was Deputy Pesapane to do? The dissent suggests that all the complaint need allege is that the deputy was aware of a risk of suicide; given that awareness, the deputy was required to do *something*. In my view, however, the failure to take additional action does not in itself support an inference of deliberate indifference. This is not the typical circumstance where a prison employee ignores an obvious and serious medical need by failing to take the obvious step of calling

for an ambulance or a doctor. In those cases when we say that the plaintiff had a "serious medical need," we mean only that the plaintiff needed medical attention, so to disregard such need was to fail to seek medical attention. *See Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1033 (10th Cir. 2020); *Sealock v. Colorado*, 218 F.3d 1205, 1210, 1212 (10th Cir. 2000) (failure to transport prisoner to doctor or hospital or to summon ambulance). Here, one must consider what protections were already in place and what the deputy had authority or expertise to do. When those matters are taken into consideration, a reasonable person could not infer that Deputy Pesapane was deliberately indifferent to the possibility that Ms. Burgaz would commit suicide.

I begin with the complaint's allegation that the SHU "dayroom itself is under constant video monitoring." Aplt. App. at 16, ¶ 57.  Such monitoring is a significant precaution against suicide. The complaint contains no allegation that any inmate had previously been able to seriously injure himself or herself while alone in the day room. Absent some exceptional circumstance (not present here), I fail to see how one could reasonably infer deliberate indifference from a deputy's failure to consider additional precautions that might be taken to perhaps slightly reduce the risk of suicide.

What more might Deputy Pesapane have done? The dissent notes that the complaint alleges that Ms. Burgaz was left "completely unattended" in the day room. Does this mean that one can infer deliberate indifference because the deputy failed to suspend her other duties and stay with Ms. Burgaz in the day room until her release (or the end of the deputy's shift)? The inference could be reasonable if Ms. Burgaz had

announced that she desperately wanted to kill herself. But there is no such allegation. Or perhaps the deputy should have stayed with Ms. Burgaz if she had been trained to comfort distressed prisoners. Again, though, there is no such allegation. Another alternative would be to move Ms. Burgaz to a regular cell. But there is no allegation in the complaint that Deputy Pesapane had authority to make the move. The only other alternative that occurs to me would have been for Deputy Pesapane to remove the TV with its cords and cables from the day room. But, as noted in the panel opinion, there is no allegation of any prior suicide attempts in the day room; and I do not think the allegations in the complaint support an inference that it would have been obvious to the deputy that removal of this amenity (which might well be expected to cause additional distress to Ms. Burgaz) was a necessary precaution.

I do not foreclose the possibility that a jury could properly find Deputy Pesapane negligent in not removing all cords and cables from the television in the day room. But it is commonplace for this court to hold that evidence sufficient to support a claim of negligence fails to support a claim of deliberate indifference. This is such a case.

3

21-1049, *Burgaz v. Board of County Commissioners*

**MATHESON**, Circuit Judge, concurring in part and dissenting in part.

Based on the standard of review for a motion to dismiss, I conclude the amended complaint plausibly alleged a constitutional violation for deliberate indifference against Deputy Pesapane and thus overcomes prong one of qualified immunity. On prong two, I would remand for the district court to decide whether the alleged violation is one of clearly established law. Because the Estate plausibly alleged a constitutional violation, I would vacate the district court's dismissal of the claims against Sheriff Shrader in his official capacity and remand for further proceedings. I concur that the Estate has failed to state a constitutional violation against Deputy Scalise.

1. **Standard of Review and Deliberate Indifference**

At the motion to dismiss stage, "all well-pleaded *facts*, as distinguished from conclusory allegations, must be taken as true, and the court must liberally construe the pleadings and make all reasonable inferences in favor of [the Estate]." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017) (quotations and alterations omitted). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotations omitted).

"Asserting a qualified immunity defense via a Rule 12(b)(6) motion subjects the defendant to a more challenging standard of review than would apply on summary

judgment.  On a motion to dismiss, it is the defendant's conduct *as alleged in the complaint* that is scrutinized for constitutionality."  *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022) (quotations, citation, and alterations omitted).  "When qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify.  Accordingly, several courts have recognized that the two-step inquiry is an uncomfortable exercise where the answer to whether there was a [constitutional] violation may depend on a kaleidoscope of facts not yet fully developed . . . ."  *Pearson v. Callahan*, 555 U.S. 223, 238-39 (2009) (quotations, citations, and alterations omitted).  "[G]ranting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotations and alterations omitted).

A 42 U.S.C. § 1983 claim for deliberate indifference in violation of the Fourteenth Amendment against Deputy Pesapane must allege both objective and subjective elements.[1]  "The subjective component is satisfied if the official 'knows of and disregards

---

[1] The objective inquiry asks "whether the harm suffered rises to a level 'sufficiently serious' to be cognizable under the [Eighth Amendment's] Cruel and Unusual Punishment Clause."  *Mata v. Saiz*, 427 F.3d 745, 752-53 (10th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Death by suicide satisfies the objective prong of deliberate indifference.  *See Cox v. Glanz*, 800 F.3d 1231, 1240 n.3 (10th Cir. 2015).  The majority agrees.  Op. at 8.
"A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer*, 511 U.S. at 828 (quotations omitted).  "The constitutional protection against deliberate indifference to a pretrial detainee's serious medical condition springs from the Fourteenth Amendment's Due Process Clause.  In evaluating such Fourteenth Amendment claims, we apply an analysis

2

an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference.'" *Mata*, 427 F.3d at 751 (quoting *Farmer*, 511 U.S. at 837) (alterations omitted).  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted); *see also Est. of Jensen by Jensen v. Clyde*, 989 F.3d 848, 859 (10th Cir. 2021).

If an official like Deputy Pesapane knew of the substantial risk, the next question is whether she "chose (recklessly) to disregard it?" *Mata,* 427 F.3d at 753.  The Supreme Court in *Farmer* defined the "deliberate indifference" standard as equal to "recklessness," in which "a person disregards a risk of harm of which he is aware."  511 U.S. at 836-37. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm . . . is the equivalent of recklessly disregarding that risk." *Id.* at 836.

## 2. Deliberate Indifference and Deputy Pesapane

We must determine whether the amended complaint alleged facts showing that Deputy Pesapane was aware of a substantial risk that Ms. Burgaz would commit suicide in the SHU dayroom and recklessly disregarded that risk.  The Estate alleged that Deputy

---

identical to that applied in Eighth Amendment cases." *Burke v. Regalado*, 935 F.3d 960, 991 (10th Cir. 2019) (quotations and citations omitted).

Pesapane was aware of three facts showing that Ms. Burgaz presented an immediate and substantial risk of suicide and that Deputy Pesapane disregarded that risk by leaving her unattended in the dayroom. The majority, by contrast, erroneously draws inferences against the Estate and in favor of Deputy Pesapane to conclude that Deputy Pesapane's conduct could be no more than negligent. *See Pace v. Swerdlow*, 519 F.3d 1067, 1073 (10th Cir. 2008) (improper to draw inferences against plaintiff on motion to dismiss).

First, the amended complaint alleged that Deputy Pesapane knew from the jail's Tiburon information management system that Ms. Burgaz had been "'red-flagged' as a suicide risk because she was . . . placed on . . . 'suicide watch' while [previously] detained" at the jail. App. at 13 ¶ 42.[2] Her "medical needs and disabilities [] placed her at higher risk for injury and self-harm relative to other detainees." *Id.* at 7-8 ¶ 2. We can reasonably infer that Deputy Pesapane was aware that Ms. Burgaz, based on her past suicidal tendencies, was a "suicide risk."[3]

The majority says the absence of allegations that Ms. Burgaz was on suicide watch or that she expressed suicidality shows that any suicide risk was not obvious. Op.

---

[2] It is reasonable to infer Deputy Pesapane knew of the information in the Tiburon system based on the allegation that "deputies assigned to the SHU exchange information at the beginning of their shift—and throughout the shift as new detainees arrive—that includes information contained in Tiburon and relevant to potential self-harm or suicidal behaviors." App. at 15 ¶¶ 52-53.

[3] The amended complaint alleged: "It is very unusual for an inmate to be red-flagged for suicide based on prior behavior within the very same facility and serves as a clear indicator that the inmate represents a high risk for suicide or self-harm relative to other inmates." App. at 13 ¶ 43.

at 11-12.  But we have never stated that a risk of suicide is obvious only if the decedent was on suicide watch or expressed suicidality or intention to harm herself.  And the red flag in Tiburon permits a reasonable inference that Deputy Pesapane knew of a suicide risk.

Second, the amended complaint alleged that Deputy Pesapane witnessed Ms. Burgaz become "distraught" and "obviously despondent" upon learning from Deputy Pesapane that she would not be immediately released from jail as she had expected and "would be held indefinitely."  App. at 8 ¶ 4, 20-21 ¶¶ 87-88.  Ms. Burgaz also "pled" for her release, explaining to Deputy Pesapane that she recently had experienced an act of "sexual violence and trauma."  *Id.* at 20 ¶ 87.  These allegations support an inference that Deputy Pesapane knew that Ms. Burgaz's suicide risk was immediate and substantial.

The majority downplays this interaction between Deputy Pesapane and Ms. Burgaz, stating (1) her pleas "were for her release, not for any medical attention or psychiatric help" and (2) "there is no allegation Deputy Pesapane had been educated to know Ms. Burgaz's grave disappointment at not being released created an imminent risk of suicide."  Op. at 12.  But this overlooks that Deputy Pesapane, through this interaction, learned that Ms. Burgaz was despondent and "in crisis," App. at 15 ¶ 90, not only because she just learned she would not be released but also because she recently suffered a sexual assault.  As for Deputy Pesapane's education, the amended complaint alleged she was "aware that . . . delivering 'bad news' to an inmate, such as [Ms. Burgaz], regarding their legal status increases the risk of self-harm and suicide."  *Id.* at 16 ¶ 56.

5

It is therefore reasonable to infer that Deputy Pesapane was aware that Ms. Burgaz was an imminent suicide risk, especially when Deputy Pesapane knew that inmates with "a history of suicidality" and "housed in a secure unit" pose "the highest risk for self-harm." *Id.* at 14 ¶ 50; *see also Ullery v. Bradley*, 949 F.3d 1282, 1288 (10th Cir. 2020) (allegations should be read "in the context of the entire complaint rather than in isolation").

Third, the amended complaint alleged the presence of "obvious suicide hazards" in the dayroom, "including a wall-mounted television with cords, cables, and a bracket." App. at 17 ¶ 62. It is reasonable to infer Deputy Pesapane was aware of them, especially because suicide by hanging was "a persistent issue" at the jail. *Id.* at 18 ¶ 63.[4]

The majority concludes "[Ms. Burgaz's] suicide in the dayroom could not have been obviously foreseen" given

(1) the security measures in the SHU, including "deputies manning the security cameras and . . . conducting the periodic walk-throughs," would have rendered Ms. Burgaz incapable "of committing suicide in the dayroom without being observed and stopped";

(2) the absence of allegations that "suicides have taken place either in the dayroom or with television cords or on the defendant deputies' watch"; and

(3) that she was "frail" and "relatively immobile," which rendered her "less capable of harming herself."

Op. at 12-13.[5]

---

[4] The amended complaint alleged that "the Individual Defendants were aware of such hazards." App. at 18 ¶ 64.

[5] The concurrence echoes the first and second points. *See* Concurrence at 2.

6

But contrary to the standard of review on a motion to dismiss, *see Pace*, 519 F.3d at 1073, at least the first two points draw inferences in favor of Deputy Pesapane and against the Estate because:

> (1) given the amended complaint's allegations of a "pattern" of deputies shirking their walk-throughs,[6] and the jail's "spate of suicides" by hanging[7]— "several . . . attributable to a lack of observation and supervision of detainees"[8]—it is unreasonable to infer that Deputy Pesapane assumed Ms. Burgaz was adequately observed and would have been stopped if she tried to harm herself;[9]

> (2) a risk of harm may be obvious even if the precise harm has not previously occurred or a defendant has not personally encountered the harm.

And as to the third point,

> (3) although Ms. Burgaz may have been "less capable of harming herself" given her physical health, the amended complaint permits a reasonable inference that Deputy Pesapane was aware that Ms. Burgaz could access the cords and the wall-mounted bracket in the dayroom.

Based on the red flag, Ms. Burgaz's despondency, and the dayroom hazards, it is reasonable to infer that Deputy Pesapane knew of an immediate and serious risk of suicide.

With knowledge of that risk, Deputy Pesapane then left Ms. Burgaz "completely unattended" in the dayroom. App. at 8 ¶ 7. She did so despite knowing that "individuals housed in the SHU require[] a higher level of care and supervision relative to other

---

[6] App. at 26 ¶ 118.

[7] App. at 9 ¶ 14, 18 ¶ 63.

[8] App. at 25 ¶¶ 116-17.

[9] The amended complaint alleged: "This spate of suicides is well-documented and known to the deputies employed by JCSO . . . ." App. at 25 ¶ 116.

inmates." *Id.* at 16 ¶ 56.  Also, several recent suicides were "attributable to a lack of observation and supervision of detainees." *Id.* at 19 ¶ 117.  The amended complaint plausibly alleged that, by abandoning Ms. Burgaz in the dayroom,[10] Deputy Pesapane recklessly disregarded a substantial risk of suicide, despite the security monitor in the SHU control room.[11]

The amended complaint thus "ple[d] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  The Estate's allegations have "nudged" the deliberate indifference claim against Deputy Pesapane "across the line from conceivable to plausible." *Id.* at 680 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  I would therefore reverse the dismissal of the deliberate indifference claim against Deputy Pesapane on prong one of qualified immunity.

3. **Issues on Remand**

I would remand for the district court to decide whether Deputy Pesapane violated clearly established law.  We recently said that an official who consciously disregards an obvious and serious medical need may violate clearly established law even if there is no case directly on point.  *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022,

---

[10] The amended complaint alleged that "the dayroom in the SHU does not have the same level of suicide mitigation measures as other areas, making it the most dangerous room in the SHU."  App. at 16 ¶ 56; *see also id.* at 20 ¶ 83.

[11] A security camera supplied a live feed of the dayroom to a monitor in the SHU control room, which displayed sixteen live feeds in total.  App. at 19 ¶ 74.

8

1031-32 (10th Cir. 2020). Other circuits are split on whether both prongs of qualified immunity collapse into a single inquiry in the deliberate indifference context. *See Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1191 n.11 (11th Cir. 2020) (suggesting that deliberate indifference to a risk of serious harm violates clearly established law even if prior case law does not put officer on notice of that risk); *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015) (addressing both prongs of qualified immunity in a single inquiry because the issues on each prong were "inextricably linked"); *Est. of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002) (rejecting approach that "collapses the deliberate indifference part of the constitutional inquiry into the qualified immunity inquiry"); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) (treating the prong one and prong two analyses as coterminous).

The parties have not briefed the issue of whether the two prongs of qualified immunity overlap in the deliberate indifference context, the district court did not address it, and we have not definitively decided it. Under these circumstances, we should follow "[t]he better practice" and "leave the matter to the district court in the first instance." *See Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1290 (10th Cir. 2011) (quotations and alterations omitted).

This course would not undermine judicial efficiency because the district court would also need to address the municipal liability claim on remand. It previously dismissed the § 1983 official capacity claim against Sherriff Shrader based on its conclusion that the amended complaint failed to allege that either Deputy Pesapane or Deputy Scalise committed an underlying constitutional violation. *See* App. at 102 ("[A]

9

municipality may not be held liable for the actions of its employees if those actions do not constitute a violation of a plaintiff's constitutional rights." (quoting *Lindsey v. Hyler*, 918 F.3d 1109, 1117 (10th Cir. 2019)).  But if, as I conclude, the amended complaint plausibly alleged an underlying constitutional violation, we would need to vacate the district court's dismissal of the official capacity claims against Sheriff Shrader and remand for further proceedings.[12]

### 4. **Response to the Concurrence**

The concurrence stretches the law of deliberate indifference too far.

First, on knowledge of risk, it suggests the Estate needed to allege facts showing Deputy Pesapane knew "that Ms. Burgaz would, as soon as she was left alone, try any means possible to kill herself."  Concurrence at 1.  But the Estate "need not show that [Deputy Pesapane] acted or failed to act believing that harm actually would befall [Ms. Burgaz]; it is enough that [Deputy Pesapane] acted or failed to act despite [her] knowledge of a substantial *risk* of serious harm."  *Farmer*, 511 U.S. at 842 (emphasis added); *see also Cox*, 800 F.3d at 1250 (officer must have "knowledge that the specific inmate at issue presented a substantial *risk* of suicide" (emphasis added)).

Second, on reckless disregard, the concurrence contends the Estate must specify what Deputy Pesapane should have done to prevent Ms. Burgaz from committing suicide and what "authority or expertise" Deputy Pesapane possessed to take those actions.

---

[12] After the district court dismissed the federal claims against the Defendants, it declined to exercise supplemental jurisdiction over the state law claims against Sherriff Shrader in his official capacity.

Concurrence at 2. But a plaintiff is not required to allege specific actions a prison official should have taken to mitigate a substantial medical risk; it is enough to allege that a prison official ignored obvious and serious medical needs.

For example, in *Quintana*, we reversed dismissal of a deliberate indifference claim against a jail official, holding the official was not entitled to qualified immunity given his "inaction in the face of" an inmate's serious medical needs. 973 F.3d at 1033. We did not address how the jail official could have prevented the inmate's death or whether he had authority to act. And in *Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000), we reversed summary judgment for a prison official who was aware that a detainee "might be having a heart attack" but took no action to address the risk. *Id.* at 1210 & n.5. Again, we did not require proof of how the defendant could have acted to abate the risk.

Here, the Estate plausibly alleged that once Deputy Pesapane was aware of an immediate and substantial suicide risk, abandoning Ms. Burgaz rather than staying with her to guard against a suicide attempt was reckless disregard. The amended complaint alleged that Deputy Pesapane, despite knowing that Ms. Burgaz "was an acute and distinct suicide risk," App. at 9 ¶ 53, "disregarded this excessive risk" by "failing to observe" her shortly after informing Ms. Burgaz that she would not be released from detention and learning that Ms. Burgaz had suffered a recent sexual assault, *id.* at 9-10 ¶ 55.

Unlike other medical emergencies where a prison guard might not know what to do, calling for help and/or staying with a suicidal detainee and observing her until other measures could be taken would be straightforward, "reasonable measures to abate" the

11

risk. *See Farmer*, 511 U.S at 847. Deputy Pesapane would perhaps have more to say on her behalf in a summary judgment motion, but to require more of the Estate at the pleading stage goes beyond what deliberate indifference case law requires.

5. **Conclusion**

I would (1) reverse as to Deputy Pesapane on prong one of qualified immunity and remand on prong two, (2) affirm as to Deputy Scalise, and (3) vacate the dismissal of the official capacity claims against Sherriff Shrader and remand for further proceedings.