FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**January 9, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

ASHLEY MYERS, individually and
as Co-Personal Representative of the
Estate of Lorri Gayle Tedder;
COURTNEY VAUGHN, individually
and as Co-Personal Representative of
the Estate of Lorri Gayle Tedder,

     Plaintiffs - Appellants,

v.

TURN KEY HEALTH CLINICS,
LLC, an Oklahoma limited liability
corporation; KYLEE FOSTER,
individually,

     Defendants - Appellees.

No. 24-5113
(D.C. No. 4:22-CV-00119-JDR-JFJ)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT\***
_____

Before **MATHESON**, **PHILLIPS**, and **ROSSMAN**, Circuit Judges.
_____

---

   \* After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

This appeal arises out of the tragic death of Ms. Lorri Tedder. While detained in pretrial custody at the Rogers County Jail in Claremore, Oklahoma (the Jail), Ms. Tedder suffered a sudden cardiac episode. She died a few days later in a local hospital. The administrators of Ms. Tedder's estate (the Estate) brought a civil rights action in federal district court in Oklahoma under 42 U.S.C. § 1983 against Nurse Kylee Foster (Nurse Foster), the attending medical caregiver at the Jail, and her employer Turn Key Health Clinics, LLC (Turn Key), a private company providing medical staffing to county jails (collectively with Nurse Foster, Defendants). The lawsuit alleged violations of Ms. Tedder's Fourteenth Amendment right to medical care in pretrial custody.[1] The district court granted summary judgment to Defendants under Federal Rule of Civil Procedure 56. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[1] The Estate's operative Second Amended Complaint alleged claims under federal and state law and named more than a dozen defendants. This appeal concerns only the district court's order granting summary judgment to Defendants on the Estate's § 1983 claims against Nurse Foster and Turn Key. The Estate settled its claims against all other defendants. In the order on appeal, the district court declined to exercise supplemental jurisdiction over the Estate's state-law claims. In a separate order, the court dismissed those claims without prejudice. The Estate has not challenged the district court's decision to decline supplemental jurisdiction or to dismiss the state-law claims.

**I**[2]

**A**[3]

On the morning of November 7, 2019, Ms. Tedder, a 55-year-old woman, was arrested at a casino and taken to the Rogers County Jail in northeastern Oklahoma. Ms. Tedder arrived at the Jail around 8:15 a.m. and soon began resisting officers. Around 8:30 a.m., officers placed Ms. Tedder in a holding cell so she could "sober up a little bit" and "lay down." Vid. 92-3, at 8:30:22–:26, 8:31:24–:27. Around 3:05 p.m., officers entered the cell, where Ms. Tedder had become undressed. Ms. Tedder resisted their attempts to dress her. The video evidence shows officers then moved Ms. Tedder to a restraint chair in the Jail's booking area. At 6:13 p.m., officers

---

[2] The facts recited here include what is depicted in videos taken from body cameras worn by officers and cameras mounted in the Jail. *See Est. of Beauford* v. *Mesa County*, 35 F.4th 1248, 1257 n.2 (10th Cir. 2022) (conducting *de novo* review of the appellate record at summary judgment). The district court relied on these videos, and so do we. Here, we cite the videos using the shorthand "Vid. [#]," referencing the district court docket number for each video exhibit. We also cite to the time stamps located at the top-left or top-right of the videos.

[3] In its summary judgment order, the district court thoroughly described the events that occurred over the ten-plus hours Ms. Tedder spent at the Rogers County Jail. Here, we describe only the facts necessary to understand and resolve the dispute at the heart of this appeal: the alleged deliberate indifference of Nurse Kylee Foster to Ms. Tedder's medical needs during the critical minutes from 6:26 to 6:30 p.m.

released Ms. Tedder from the chair. Although she appeared calm while officers unshackled her from the chair, Ms. Tedder immediately began to scream, thrash, and strike the officers upon release. The officers wrestled Ms. Tedder to the ground and handcuffed her.

Around that time, Nurse Kylee Foster arrived early for her shift. On the video, she can be seen standing in the doorway of her office watching officers restrain Ms. Tedder. At 6:19 p.m., officers attempted to carry Ms. Tedder back to a holding cell. A struggle ensued, and Ms. Tedder appeared to hit her head on a wall. At 6:21 p.m., officers noticed Ms. Tedder had urinated on the floor, and Nurse Foster approached to help clean up.

What happened next, over the course of about five minutes, is key to this case. At 6:26 p.m., officers can be seen on video carrying a limp Ms. Tedder to a nearby holding cell and placing her on a concrete bench. One of the attending officers spotted blood, summoned Nurse Foster into the cell, and pointed the nurse to a cut on Ms. Tedder's forehead. At 6:27 p.m., videos show Nurse Foster took a pulse-check of Ms. Tedder's foot—a so-called "pedal pulse"—for fourteen seconds (Pulse Check #1). *See* Vid. 92-15, at 18:27:45–:59 (body-camera video); Vid. 92-30, at 06:27:45–:59 (mounted-camera video). Nurse Foster later testified that, during Pulse Check #1, she "felt a pulse" but observed Ms. Tedder's breathing was "very shallow and

4

uneven." RII.401–02. At approximately 6:28 p.m., while Nurse Foster was still with Ms. Tedder and before she left the cell, an officer called emergency services.

Nurse Foster left the cell at 6:28 p.m. According to her deposition testimony, she went to get medical supplies to clean Ms. Tedder's head wound and to retrieve a machine to check Ms. Tedder's vital signs. Meanwhile, four officers stayed in the cell with Ms. Tedder.

At 6:29 p.m., one of the officers in the cell called out that Ms. Tedder was "not blinking." Vid. 92-15, at 18:29:02–:04. That officer then left the cell to retrieve Nurse Foster. According to the video evidence, Nurse Foster returned to the holding cell within the minute and, before re-entering the cell, instructed an officer to tell the ambulance to "come hot." Vid. 92-15, at 18:29:47–:49.

Upon re-entering the cell and seeing Ms. Tedder, Nurse Foster flailed her arms upward and said, "Oh, Jesus!" Vid. 92-15, at 18:29:50–:55 (body-camera video); Vid. 92-30, at 06:29:50–:55 (mounted-camera video). At 6:29:55 p.m., body-camera video shows Nurse Foster asking an officer for a flashlight and bending over Ms. Tedder to check her vital signs. The two video cameras in the holding cell did not record all of Nurse Foster's actions

5

between 6:30:03 p.m. and 6:30:24 p.m.[4] Nurse Foster later prepared a handwritten incident report (the Foster Report), which included a summary of her conduct between 6:29 and 6:30 p.m. According to the Foster Report, Nurse Foster was "called back" to the cell at "1829" (6:29 p.m.), found Ms. Tedder's eyes "fixed & dilated," requested a flashlight from another officer, observed Ms. Tedder's eyes were "not reactive to light," noticed Ms. Tedder's "skin ha[d] become cool," could not find a pulse (Pulse Check #2), instructed officers to tell the ambulance to "come 'hot[,]'" asked for an oxygen tank and an Automatic External Defibrillator (AED), and then started CPR. RII.302.

The videos taken in the holding cell show Nurse Foster checked Ms. Tedder's eyes for reaction to light at 6:30:05 p.m. and then instructed officers to retrieve an oxygen tank. Nurse Foster started chest compressions

---

[4] Two videos in the appellate record partially depict Nurse Foster's actions during this twenty-one-second interval, but these recordings are imperfect. One video comes from a body camera worn by an officer standing in the holding cell's entryway. *See* Vid. 92-15, at 18:30:03–:24. This video recorded the scene at a distance from Ms. Tedder and therefore did not get a direct look at all of Nurse Foster's actions. In addition, the recording officer was using his cell phone in front of his body camera, obscuring the bottom third of the visual feed. And the officer steps out of the holding cell for about twelve seconds (between 6:30:12 and 6:30:24 p.m.). The other video comes from a camera mounted near the ceiling in the corner of the holding cell. *See* Vid. 92-30, at 06:30:03–:24. There is no audio. And during the twenty-one seconds at issue here, Nurse Foster had her back to the mounted camera, obscuring nearly all of her actions.

on Ms. Tedder at 6:30:24 p.m. At 6:30:30 p.m., Nurse Foster instructed an officer to continue CPR and again called for an oxygen tank. CPR continued for approximately seventy seconds. At 6:31:34 p.m., CPR was interrupted while officers and Nurse Foster removed Ms. Tedder's handcuffs and applied an AED to Ms. Tedder's chest. At 6:32:59 p.m., Nurse Foster directed an officer to continue CPR while she connected the oxygen tank.

Emergency responders arrived at the Jail and entered the holding cell within the next minute. Nurse Foster then left the cell to give space to the EMTs, while the same officer continued to administer CPR until first responders took over. The EMTs eventually revived Ms. Tedder's pulse and transported her to a local hospital.

Ms. Tedder died at the hospital two days later. Her cause of death was "sudden cardiac death in the setting of psychosis, physical exertion and restraint." RIV. at 926 (capitalization altered).

**B**

In April 2022, the Estate filed the operative Second Amended Complaint in federal district court. The Estate alleged, under 42 U.S.C. § 1983, Nurse Foster violated Ms. Tedder's Fourteenth Amendment right to "medical aid" while in pretrial detention. RI.43. According to the Estate, Nurse Foster "disregarded the substantial risk of serious harm" to

7

Ms. Tedder and failed to provide "any medical assistance, despite the obvious signs and symptoms . . . which Foster knew or should have known would increase Tedder's likelihood of serious injury or death." RI.33. The Estate also claimed Turn Key was liable under *Monell* v. *Department of Social Services of the City of New York*, 436 U.S. 658 (1978) for violating Ms. Tedder's Fourteenth Amendment rights. The Estate alleged Turn Key "negligently failed to train and supervise their employee on how to assess, diagnose, and treat patients like Tedder." RI.51. The Estate also claimed Turn Key had a custom of delaying medical care for detainees in serious medical need.

Nurse Foster and Turn Key moved for summary judgment on all claims asserted against them. Nurse Foster argued the Estate had not shown evidence sufficient to establish "there actually was a violation of [Ms. Tedder]'s constitutional rights, i.e. that there was deliberate indifference to Tedder's serious medical needs." RII.351. Turn Key similarly argued that, if no constitutional violation occurred, the "§ 1983 claim against Turn Key fails as a matter of law." RI.197. The Estate responded by arguing that the evidence of Nurse Foster's deliberate indifference was in genuine dispute.

The district court granted summary judgment to Defendants. The district court correctly stated the summary judgment standard:

"Defendants [as nonmovants] must either (1) produce affirmative evidence negating either the objective or the subjective component, or (2) show that there is no evidence from which a jury could conclude that both components are satisfied." RV.1190 (first citing *Pelt* v. *Utah,* 539 F.3d 1271, 1280 (10th Cir. 2008); then citing Fed. R. Civ. P. 56). The district court first considered the Estate's claim that Nurse Foster was deliberately indifferent to Ms. Tedder's medical needs. In the district court's view, the Estate had "not pointed to any evidence" to establish a genuine dispute of material fact over Nurse Foster's deliberate indifference, and thus Nurse Foster was entitled to summary judgment as a matter of law on the § 1983 claim. RV.1195, 1200. As to Turn Key, the district court determined it cannot be liable for "injuries allegedly resulting from Nurse Foster's conduct" because Nurse Foster had not committed a constitutional violation. RV.1200. The district court then considered and rejected the Estate's *Monell* theories that Turn Key failed to train its employees and had a custom of delaying medical care. The district court granted summary judgment to Defendants and entered final judgment.

This timely appeal followed.

9

## II

### A

"We review the grant of summary judgment de novo, and apply the same legal standard used by the district court under Federal Rule of Civil Procedure 56(c)." *Est. of Beauford* v. *Mesa County*, 35 F.4th 1248, 1261 (10th Cir. 2022). "Summary judgment is appropriate if 'the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Thomas* v. *Int'l Bus. Machs.*, 48 F.3d 478, 486 (10th Cir. 1995) (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Movants are entitled to summary judgment only if they "produc[e] affirmative evidence negating an essential element of the non-moving party's claim" or if they "show[] that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Pelt*, 539 F.3d at 1280 (internal quotation marks omitted). "If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the

10

nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Thom* v. *Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). "The summary judgment standard requires us to construe the facts in the light most favorable to the nonmovant and to draw all reasonable inferences in its favor." *Est. of Beauford*, 35 F.4th at 1261. "We do not have to accept versions of the facts contradicted by objective evidence, such as video surveillance footage." *Id.* (citing *Scott* v. *Harris*, 550 U.S. 372, 380 (2007)).

## B

At issue is the district court's grant of summary judgment on the Estate's claims that Nurse Foster violated Ms. Tedder's Fourteenth Amendment rights and that Turn Key failed to train its employees and had an unconstitutional custom of delayed medical care. We now describe the applicable law relevant to each theory of liability.

## 1

"The Fourteenth Amendment's Due Process Clause entitles pretrial detainees to the same standard of medical care that the Eighth Amendment requires for convicted inmates." *Est. of Beauford*, 35 F.4th at 1262 (internal quotation marks omitted). "Prison officials violate the Constitution when

they act with 'deliberate indifference to an inmate's serious medical needs.'" *Id.* (internal quotation marks omitted).

The deliberate-indifference standard contains "both an objective and a subjective component." *Id.* "[T]he focus of the subjective component is the mental state of the defendant with respect to the risk of that harm." *Id.* (internal quotation marks omitted). In the context of pretrial detention, the subjective component requires that a plaintiff establish "the official [1] knows of and [2] disregards an excessive risk to inmate health or safety[.]" *Id.* at 1263 (quoting *Farmer* v. *Brennan*, 511 U.S. 825, 837 (1994)). "[A]bsent an extraordinary degree of neglect," the subjective component is not satisfied "where a doctor merely exercises his considered medical judgment" or "provides a level of care consistent with the symptoms presented by the inmate[.]" *Id.* at 1270–71 (second alteration added) (quoting *Self* v. *Crum*, 439 F.3d 1227, 1232–33 (10th Cir. 2006)). "[A] mere difference of opinion over matters of expert medical judgment or a course of medical treatment fails to rise to the level of a constitutional violation." *Id.* at 1271 (internal quotation marks omitted). "Nor will we freely substitute [our] judgment for that of [the medical provider at issue] or otherwise second-guess [their] course of treatment with the benefit of hindsight." *Id.* (second alteration added) (internal quotation marks omitted).

**2**

It is well established "*Monell* allows plaintiffs to sue local governing bodies (or their functional equivalents) directly under § 1983 for constitutional violations pursuant to a body's policy, practice, or custom." *Est. of Burgaz* v. *Bd. of Cnty. Comm'rs for Jefferson Cnty.*, 30 F.4th 1181, 1189 (10th Cir. 2022). A *Monell* claim generally requires the plaintiff to "allege facts showing: (1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Id.* "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, caselaw from this and other circuits has extended the *Monell* doctrine to private § 1983 defendants." *Dubbs* v. *Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (footnote omitted). Plaintiffs allege Turn Key is a private entity. Turn Key does not argue it cannot be held liable under *Monell*, and so we assume for purposes of this appeal that it can. *See Buchanan* v. *Turn Key Health Clinics, LLC*, No. 22-7029, 2023 WL 6997404, at *7 (10th Cir. Oct. 24, 2023) (unpublished) (making this same assumption when the same defendant did not argue it cannot be held liable under *Monell*); *Lucas* v. *Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 n.6 (10th Cir. 2023) (noting that Turn Key did not dispute it can be liable under *Monell*).

Our precedent recognizes several types of *Monell* claims against a municipal entity. As relevant here, one type of *Monell* claim alleges the failures of a municipality (or a private entity acting under color of state law) "are the driving force behind a constitutional violation by a specific municipal employee." *Crowson* v. *Washington County*, 983 F.3d 1166, 1186 (10th Cir. 2020). "A failure-to-train claim is an example" of this kind of "driving force" § 1983 claim. *Id.* Under this sort of *Monell* claim, "an individual . . . must have committed a constitutional violation." *Est. of Burgaz,* 30 F.4th at 1189.

Another type of *Monell* claim alleges that "a formally promulgated policy, well-settled custom or practice, or final decision by a policymaker . . . 'itself is unconstitutional.'" *Crowson*, 983 F.3d at 1187 (citation omitted); *see Thao* v. *Grady Cnty. Crim. Just. Auth.*, 159 F.4th 1214, 1233 n.13 (10th Cir. 2025) (explaining "such a claim represents a different theory of municipal liability"). For this type of claim, sometimes referred to as a "systemic" theory of *Monell* liability, "plaintiffs need not demonstrate an individual officer committed a constitutional violation. Instead, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Est. of Burgaz*, 30 F.4th at 1190 (internal quotation marks omitted);

14

*Crowson*, 983 F.3d at 1191–92 (calling the "systemic" theory a "limited exception" to the usual requirement for individual unconstitutional action). That is, "the municipality may not escape liability by acting through twenty hands rather than two." *Thao*, 159 F.4th at 1233 n.13 (quoting *Crowson*, 983 F.3d at 1191). Whatever *Monell* theory a plaintiff advances, it is well settled "a claim under § 1983 against either an individual actor or a municipality cannot survive a determination that there has been no constitutional violation." *Crowson*, 983 F.3d at 1186.

## III

Given these principles and the arguments raised on appeal, we discern no error in the district court's decision to grant summary judgment to Defendants. We discuss the ruling applicable to each defendant in turn.

## A

We begin with Nurse Foster. The Estate claimed Nurse Foster was deliberately indifferent to Ms. Tedder's medical needs. Before the district court, Nurse Foster conceded the objective component of the deliberate-indifference standard—whether plaintiff "suffered from a sufficiently serious medical need"—is satisfied in this case. RV.1190–91 (citing *Lucas*, 58 F.4th at 1136). According to the district court, the evidence at summary judgment, viewed in the light most favorable to the Estate, established no

15

genuine dispute of material fact. In the district court's view, "the facts of this case do not establish that Nurse Foster was deliberately indifferent to Ms. Tedder's medical needs at any point during the time she was present at the jail." RV.1200.

The parties do not dispute the objective component on appeal—and for good reason. *See Sealock* v. *Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) ("A medical need is sufficiently serious if it is . . . so obvious that even a lay person would easily recognize the necessity for a doctor's attention." (internal quotation marks omitted)). We focus then on what the parties agree is the "crux" of disagreement: the subjective component. Op. Br. at 13–14; Resp. Br. at 14. Recall, the subjective component of a deliberate-indifference claim requires a plaintiff to establish the defendant both (1) knew of and (2) disregarded an "excessive risk to inmate health or safety[.]" *Est. of Beauford*, 35 F.4th at 1263 (quoting *Farmer*, 511 U.S. at 837).

In the district court, the Estate claimed Nurse Foster left Ms. Tedder in a holding cell without administering care even though she knew Ms. Tedder lacked a pulse. In support, the Estate pointed to the Foster Report, where the Estate claimed Nurse Foster admitted she did not find Ms. Tedder's pulse during Pulse Check #1 at 6:27 p.m. but still left the holding

cell at 6:29 p.m. to retrieve supplies. This evidence, the Estate insisted, created a genuine dispute of material fact as to whether Nurse Foster "knew of and disregarded" a substantial risk to Ms. Tedder's health before leaving the holding cell. RII.491 (quoting *Al-Turki* v. *Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014)).

The district court rejected the Estate's argument. *First*, as to what Nurse Foster "knew," the district court relied on body-camera footage, showing that Nurse Foster conducted Pulse Check #1 at 6:27 p.m. The district court also relied on Nurse Foster's deposition, where she testified that she found Ms. Tedder's pulse and observed her breathing before leaving the cell. As to the Foster Report, the district court determined it "does not contravene Defendants' position" that Nurse Foster found a pulse during Pulse Check #1 at 6:27 p.m. RV.1195. The district court also emphasized footage from inside the holding cell at 6:29 p.m., which showed Nurse Foster's "immediate change in behavior . . . when she was called back to the cell." RV.1197; *see also* RV.1197 n.38. Nurse Foster's "visible and audible" alarm, the district court reasoned, indicated she "subjectively believed Ms. Tedder did not need CPR when she left the holding cell and immediately came to a different conclusion upon her return." RV.1197–98 & n.38.

17

*Next*, as to what Ms. Tedder supposedly "disregarded," the district court concluded "Nurse Foster did not engage in constitutionally deficient care by leaving Ms. Tedder under the supervision of multiple officers while she gathered supplies to treat Ms. Tedder's wound and obtain a machine to record her vital signs prior to the arrival of emergency services." RV.1199. Thus, "[b]ecause the facts of this case do not establish that Nurse Foster was deliberately indifferent to Ms. Tedder's medical needs," the district court granted summary judgment to Nurse Foster. RV.1200.

On appeal, the parties disagree whether the Estate, as nonmoving party, has "'set forth specific facts' . . . from which a rational trier of fact could find" that Nurse Foster was deliberately indifferent to an excessive risk to Ms. Tedder's health or safety. *Thom*, 353 F.3d at 851 (quoting Fed. R. Civ. P. 56(e)). The Estate urges reversal, contending the Foster Report contravenes the other evidence showing Nurse Foster found a pulse during Pulse Check #1, at 6:27 p.m., and that the district court mistakenly concluded otherwise. According to the Estate, the Foster Report "explicitly states that no pulse was detected" by Nurse Foster during Pulse Check #1 at 6:27 p.m. Op. Br. at 14. The Estate cites a statement in the Foster Report that Nurse Foster was "not able to find a pulse." RII.302. The Estate claims this statement refers to Pulse Check #1 (before Nurse Foster left the cell)

18

and not Pulse Check #2 (after she left the cell). And since Nurse Foster supposedly knew Ms. Tedder had no pulse during Pulse Check #1, the Estate argues, Nurse Foster's decision to leave the cell shows a disregard of the substantial risk Ms. Tedder faced. The Estate also argues that, even assuming Nurse Foster believed Ms. Tedder had a pulse and was breathing before she left the holding cell, her "departure, given Ms. Tedder's visibly dire condition, amounted to a reckless disregard for the substantial risk of serious harm she faced[.]" Op. Br. at 16.

Nurse Foster urges affirmance. She maintains there is "no genuine question of fact as to [her] subjective knowledge and belief." Resp. Br. at 12 (bolding omitted). The body-camera video, the Foster Report, and witness testimony—all considered by the district court—confirm she took Ms. Tedder's pulse twice: first, a pedal pulse at 6:27 p.m. (Pulse Check #1, depicted on video), when she found a pulse; and a second pulse check at 6:30 p.m. (Pulse Check #2, as noted in the Foster Report), when she did not find a pulse. The "not able to find a pulse" line in the Foster Report specifically references Pulse Check #2. Given this evidence of her subjective knowledge during these critical few minutes, Nurse Foster contends the Estate's claim that she should have administered CPR before leaving the cell amounts, at best, to accusations of negligence insufficient to support a

19

constitutional violation. Resp. Br. at 17–18 (citing *Self*, 439 F.3d at 1233 ("[N]egligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.")).

Nurse Foster has the availing argument. Body-camera video shows Nurse Foster took Pulse Check #1 at 6:27 p.m., before she left the cell. Nurse Foster testified she saw Ms. Tedder breathing and "felt a pulse" *before* leaving the cell. RII.402. At 6:29 p.m., Nurse Foster returned to the holding cell and, upon seeing the change in Ms. Tedder's appearance, reacted with obvious alarm. The district court properly understood Nurse Foster's "visible and audible reaction to Ms. Tedder's condition upon returning to the cell" as shock and panic—a reaction further supporting the inference that "Nurse Foster subjectively believed Ms. Tedder had a pulse when she left the holding cell to retrieve supplies." RV.1197 & n.38.

The Estate's contrary argument is "contradicted by objective evidence[.]" *Est. of Beauford*, 35 F.4th at 1261. Here, we endorse and adopt the district court's careful parsing of the record. The Estate continues to insist the Foster Report "explicitly states" Nurse Foster failed to find a pulse during Pulse Check #1. Op. Br. at 14. But the district court rejected that argument, and so do we. The Foster Report simply does not mention

Pulse Check #1. The Estate claims the line in the Foster Report that Nurse Foster was "not able to find a pulse" refers to Pulse Check #1. As the district court correctly concluded, however, this line obviously refers to Pulse Check #2. The Foster Report states, at "1829" (or 6:29 p.m.), Nurse Foster returned to the holding cell after being "called back to check [Ms. Tedder's] breathing." RII.302. The Foster Report then explains, around "1830" (or 6:30p.m.), Nurse Foster conducted vital-sign checks on Ms. Tedder and only *then* was "not able to find a pulse." RII.302. The Foster Report shows Nurse Foster could not find a pulse at 6:30 p.m., *after* she had returned to the holding cell, during Pulse Check #2. As the district court cogently explained, the objective evidence at summary judgment shows "most of the events listed" in the Foster Report occurred as described, and there is no basis to conclude only "one of them did not" occur as described.[5] RV.1196. The Estate does not attempt to argue otherwise. Rather, the Estate merely asserts

---

[5] As the district court recognized, the Foster Report states Nurse Foster requested the ambulance "come hot" after she re-entered the holding cell and used the flashlight. But the video evidence shows Nurse Foster requested the ambulance "come hot" *before* re-entering the holding cell or using the flashlight. The Estate does not raise this discrepancy or try to argue it is "material"—*i.e.*, that it would "affect the outcome of the suit under the governing law[.]" *Thomas*, 48 F.3d at 486 (quoting *Anderson*, 477 U.S. at 248). In any event, this discrepancy does not create a genuine dispute of material fact or otherwise change the summary judgment disposition.

Nurse Foster did not find a pulse before leaving the cell. As we have explained, no evidence supports this conclusory statement, and the evidence at summary judgment undermines it. We therefore agree with the district court that no reasonable jury could conclude Nurse Foster subjectively "knew of" an excessive risk of harm to Ms. Tedder before she left the holding cell. *Est. of Beauford*, 35 F.4th at 1263 (quoting *Farmer*, 511 U.S. at 844); *see* RV.1199.

The lack of genuine dispute of material fact over Nurse Foster's knowledge—without more—means she is entitled to summary judgment as a matter of law on the § 1983 claim. *See Farmer*, 511 U.S. at 837 (explaining a deliberate indifference claim requires that "the official knows of *and* disregards an excessive risk to inmate health or safety; the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference" (emphasis added)); *Est. of Beauford*, 35 F.4th at 1271 (explaining that, "absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met" for liability (quoting *Self*, 439 F.3d at 1233)).

Still, for sake of completeness, we also consider what Nurse Foster purportedly disregarded. Recall, the evidence shows Nurse Foster, before leaving the holding cell, subjectively believed Ms. Tedder was breathing and

22

had a pulse. Nurse Foster testified CPR is necessary when an individual has no pulse and is not breathing. And emergency responders were already on the way to the Jail before Nurse Foster left the cell.

Given these circumstances, we agree with the district court and Defendants that Nurse Foster's decisions—to gather supplies to treat Ms. Tedder's head wound, to check her vital signs, and to leave four officers to monitor Ms. Tedder in the cell—show "a level of care consistent with the symptoms presented by the inmate[.]" *Est. of Beauford*, 35 F.4th at 1271 (quoting *Self*, 439 F.3d at 1233). As the district court observed, objective record evidence confirms that, as soon as she realized Ms. Tedder's status had changed for the worse, Nurse Foster's demeanor changed visibly. She then immediately re-checked Ms. Tedder's vital signs and within seconds began CPR. The district court thus correctly concluded Nurse Foster produced affirmative evidence negating the Estate's argument that she disregarded an excessive risk to inmate health or safety.[6]

---

[6] Even assuming the Estate could show negligence, that does not suffice for deliberate indifference. *Self*, 439 F.3d at 1233. Rather, under § 1983, conduct rising to the level of a constitutional violation must exceed "even gross negligence[.]" *Berry* v. *City of Muskogee*, 900 F.2d 1489, 1495 (10th Cir. 1990) (citing *City of Canton* v. *Harris*, 489 U.S. 378, 388 & n.7 (1989)).

Drawing all reasonable inferences in favor of the Estate, we agree with the district court that there is no genuine dispute of material fact over Nurse Foster's conduct. We thus affirm the grant of summary judgment to Nurse Foster.

## B

We next turn to the district court's grant of summary judgment to Turn Key. Recall, the Estate alleged Turn Key is liable under *Monell* for (1) failing to train or supervise[7] Nurse Foster and (2) having an unlawful custom of delaying medical care for detainees. Both a failure-to-train claim and an unconstitutional-custom claim have three elements: (1) the existence of a municipal policy or custom involving deficient training;

---

[7] In its operative complaint and appellate briefing, the Estate often uses "train" and "supervise" synonymously and frequently pairs the terms together. *See, e.g.*, RI.50 (alleging "Turn Key negligently failed to train and supervise"); RI.58 (alleging a policy, practice, or custom of detaining individuals suffering a severe mental health crisis "without proper training and supervision"); RI.75–78, 97, 106 (alleging defendants failed to "train and/or supervise"); Op. Br. at 2 (arguing for liability for "failing to adequately train, supervise, or implement policies"); Op. Br. at 19 (framing the claim as "Failure to Train and Supervise"). To the extent there are differences between a failure-to-train claim and failure-to-supervise claim, those differences do not matter for this appeal, and no party argues otherwise. Under our precedent, both failure-to-supervise claims and failure-to-train claims require an individual to have committed a constitutional violation in order to hold the municipality liable. *See Est. of Burgaz*, 30 F.4th at 1189. Thus, the failure to train and/or to supervise theories, whether viewed separately or together, fail as a matter of law.

24

(2) the policy or custom's causation of an injury; and (3) the municipality's adoption of a policy or custom with deliberate indifference. *See Lance*, 985 F.3d at 800 (failure to train); *Schneider* v. *City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (unconstitutional custom).

The district court understood each claim as encompassing both a driving-force theory and a systemic-failure theory. That is, the district court seemed to assume the Estate had alleged that both its failure-to-train claim and its unconstitutional-custom claim could succeed based on Nurse Foster's constitutional violations and Turn Key's systemic failures.[8]

---

[8] The district court incorrectly assumed a failure-to-train claim can succeed on a systemic theory. In this circuit, a "failure to train claim . . . is dependent upon a predicate violation" by an individual officer. *Crowson*, 983 F.3d at 1192; *see id.* at 1186–91 (collecting and discussing cases). So "[w]hen there is no underlying constitutional violation by a county officer, there cannot be an action *for failing to train or supervise the officer*." *Id.* at 1189 (alteration and emphasis in original) (internal quotation marks omitted); *accord Trigalet* v. *City of Tulsa*, 239 F.3d 1150, 1155–56 (10th Cir. 2001).

Still, as we explain, the district court's erroneous assumption—that a plaintiff can prevail on a systemic failure-to-train claim—does not change our analysis or conclusion. On appeal, the Estate has affirmatively disclaimed any systemic theories. Instead, the Estate expressly yokes its *Monell* claims to Nurse Foster's purported wrongdoing. As the Estate explains, "no violation by Nurse Foster, so no liability for her employer." Reply Br. at 9. We do not need to reach the argument passed upon by the district court as a result of its erroneous assumption because the Estate has disclaimed these arguments on appeal.

25

The district court first considered the Estate's two claims under a driving-force theory. Recall, a driving-force theory of *Monell* liability requires an individual to have committed a constitutional violation for the entity to be liable. "Because Nurse Foster did not commit a constitutional violation with respect to her provision of medical care to Ms. Tedder," the court reasoned, "by extension . . . Turn Key is not liable for the injuries allegedly resulting from Nurse Foster's conduct." RV.1200. The district court concluded Turn Key could not be liable under a driving-force *Monell* theory on either of the Estate's two claims because an individual had not committed a constitutional violation.[9]

After rejecting the driving-force theory, the district court considered whether the failure-to-train and unconstitutional-custom claims could succeed under a systemic theory. Recall, under a systemic theory of *Monell*

---

[9] The district court "[a]ssum[ed], without deciding," that the Estate had alleged a *Monell* claim based upon the purportedly deficient intake practices by Nurse Amy Moore, who was on shift before Nurse Foster. RV.1201. However, as Defendants point out, the Estate fails to mention Nurse Moore in its appellate briefing. Thus, the Estate has abandoned any argument related to Nurse Moore. "[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief." *Bronson* v. *Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007). That includes arguments abandoned on appeal. *See In re Bryan*, 857 F.3d 1078, 1095 n.48 (10th Cir. 2017). Accordingly, we decline to address any argument related to Nurse Moore.

liability, "plaintiffs need not demonstrate an individual officer committed a constitutional violation" for an entity to be liable. *Est. of Burgaz*, 30 F.4th at 1190. The district court rejected the failure-to-train claim under a systemic theory, concluding the Estate produced no evidence "that Turn Key was deliberately indifferent to the need to provide more or different training." RV.1203. The district court also rejected the custom-of-delayed-medical-care claim under a systemic theory. The Estate alleged "Turn Key had a de facto policy that permitted its employees to 'wait and see' whether an inmate exhibiting erratic behaviors would calm down with time[.]" RV.1204. Even assuming such a policy existed, the district court reasoned, the Estate "failed to point to any evidence of a direct, causal link between Turn Key's actions (or inactions) and the harm that befell Ms. Tedder." RV.1203–04. According to the district court, the Estate pointed to no evidence showing "Turn Key had actual or constructive notice" that the policy "was substantially certain to cause a constitutional violation," and that Turn Key actually "disregarded that risk," RV.1204.

On appeal, the Estate claims the district court erred by granting summary judgment to Turn Key on the Estate's failure-to-train and unconstitutional-custom claims. The Estate says "Turn Key's *Monell* liability hinges on the existence of an underlying constitutional violation."

27

Op. Br. at 18 (capitalization altered and bolding omitted); *see id.* (explaining *Monell* liability "generally requires proof of an underlying constitutional violation by an individual acting under color of law"). Defendants agree. "[W]ithout a predicate constitutional violation by Nurse Foster," Defendants argue, "Turn Key cannot, as a matter of law, be held liable." Resp. Br. at 19. In reply, the Estate affirmatively acknowledges "[i]t is well established that a municipality or its equivalent (like Turn Key, a private entity providing medical services in the jail) '**may not be held liable where there was no underlying constitutional violation by any of its officers.**'" Reply Br. at 9 (bolding in original) (quoting *Hinton* v. *City of Elwood,* 997 F.2d 774, 782 (10th Cir. 1993)). If Nurse Foster did not commit a predicate constitutional violation, the Estate concedes, then its *Monell* claims fail. On appeal, as to this issue, "the parties are in radical agreement." *A.J.T. ex rel. A.T.* v. *Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 350 (2025).

Reviewing the district court order based on the arguments presented on appeal, we discern no error. The Estate's appellate concessions resolve its *Monell* claims and establish that Turn Key is entitled to judgment as a matter of law. We have already explained summary judgment is appropriate as to Nurse Foster because she did not commit a constitutional violation.

28

And the Estate has abandoned any argument involving Nurse Moore on appeal. *See supra* note 9. That disposes of any *Monell* claim depending on an individual's unconstitutional conduct, leaving only one avenue—a systemic theory of liability—for the Estate to prevail on its *Monell* claims. But the Estate has abandoned any systemic theory on appeal, admitting its *Monell* claims fail "where there was no underlying constitutional violation by any of its officers." Reply Br. at 9 (bolding omitted) (quoting *Hinton*, 997 F.2d at 782); *see United States* v. *Olano,* 507 U.S. 725, 733 (1993); *United States* v. *Carrasco-Salazar*, 494 F.3d 1270, 1273 (10th Cir. 2007) (observing an issue is waived when a party "expressly raised this issue . . . then proceeded to abandon it" (internal quotation marks omitted)).

Under these circumstances, we need not decide whether the Estate's systemic theories succeed on the merits. To the extent the district court assumed the Estate's claims could be viable without unconstitutional conduct by Nurse Foster, the Estate has "affirmatively disclaimed" any appellate arguments relying on that assumption. *United States* v. *Moore*, 22 F.3d 241, 243 n.3 (10th Cir. 1994). Rather, the Estate has yoked its *Monell* claims to Nurse Foster's purported wrongdoing: "no violation by Nurse Foster, so no liability for her employer." Reply Br. at 9. We do not need to reach any arguments based on the district court's assumption, because the

29

Estate has waived any such arguments. *See McDonald* v. *Kinder-Morgan, Inc.*, 287 F.3d 992, 999 n.5 (10th Cir. 2002) (declining to address an argument when a party has "explicitly disclaimed any such argument" on appeal).

As to the failure-to-train claim, the Estate agrees *Monell* liability "generally requires proof of an underlying constitutional violation by an individual acting under color of law." Op. Br. at 18; *see* Reply Br. at 9. This statement is consistent with what our law requires. *See Crowson*, 983 F.3d at 1186–92 (collecting cases and explaining a failure-to-train claim "is dependent upon a predicate violation" of the Constitution by an individual officer); *id.* at 1189 (stating "[w]hen there is no underlying constitutional violation by a county officer, there cannot be an action *for failing to train or supervise the officer*" (emphasis in original) (internal quotation marks omitted)). As far as the Estate's unconstitutional-custom claim, we have explained that when a plaintiff "predicates its unconstitutional-custom claim on the existence of an individual constitutional violation, and no individual deputy committed a constitutional violation . . . the claim fails." *Est. of Burgaz*, 30 F.4th at 1190. "To be sure, the Estate *could have* argued that the [officers]' combined actions or omissions somehow violated Ms.

[Tedder]'s rights. But the Estate failed to do so," and so the argument "is waived before this court." *Id.* (emphasis added) (footnote omitted).

In conclusion, we agree with the district court that Turn Key has carried its burden, as movant, to show there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. *Est. of Beauford*, 35 F.4th at 1261. The Estate in turn has failed "to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler* v. *Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (quoting Fed. R. Civ. P. 56(e)); *see id.* (concluding the nonmovant failed to carry its burden at summary judgment after the movant carried its initial burden); *McKibben* v. *Chubb*, 840 F.2d 1525, 1532–33 (10th Cir. 1988) (similar).[10] We therefore affirm the grant of summary judgment to Turn Key on the Estate's *Monell* claims.

---

[10] Finally, to the extent the Estate urges reversal because the district court "improperly resolved credibility determinations and factual inferences," we readily reject this contention. Op. Br. at 11 (capitalization altered and bolding omitted). In its thorough and well-reasoned order, the district court faithfully applied Rule 56, which governs the summary judgment standard. *See* RV.1190–91 (district court discussing and applying Rule 56); RV.1196 (district court discussing the requirement at summary judgment to draw all reasonable inferences in favor of the Estate).

**IV**

We affirm the district court's grant of summary judgment to Nurse Foster and Turn Key.

Entered for the Court


Veronica S. Rossman
Circuit Judge